138 Ill.2d 255 (1990)
562 N.E.2d 174
In re ADOPTION OF PAUL TIMOTHY SYCK (Mark T. Syck et al., Appellees,
v.
Lorrie A. Snyder, Appellant).
No. 69415.
Supreme Court of Illinois.
Opinion filed October 4, 1990.
*256 *257 *258 Heyl, Royster, Voelker & Allen, of Peoria (Karen L. Kendall, Timothy L. Bertschy and Joseph G. Feehan, of counsel), for appellant.
Patrick T. Chambers, of Peoria, for appellees.
Judgments reversed.
JUSTICE STAMOS delivered the opinion of the court:
This appeal is from a decision by the circuit court of Peoria County adjudging Lorrie A. Snyder to be an unfit parent of Paul Timothy Syck, a minor, as defined by section 1(D)(b) of the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(b)), and terminating her parental rights. The appellate court affirmed the finding of parental unfitness and termination of parental rights. (192 Ill. App.3d 1115 (unpublished order under Supreme Court Rule *259 23).) We granted Lorrie A. Snyder's petition for leave to appeal under Supreme Court Rule 315 (107 Ill.2d R. 315).

FACTS
On February 2, 1988, Mark T. Syck, the natural father of the minor Paul Timothy Syck, and Lisa M. Syck, Mark's second wife, filed a petition for adoption of Paul. Before a minor may be adopted, it is necessary either for the minor's natural parents or guardian to consent to the adoption or for a court to find that the natural parents are unfit. (Ill. Rev. Stat. 1987, ch. 40, pars. 1510(a)(1), (b)(1).) When Mark informed Lorrie, his former wife and Paul's natural mother, that he and Lisa intended to adopt Paul, Lorrie refused to consent to the adoption. Consequently, Mark and Lisa alleged in their petition for adoption that Lorrie was an unfit parent under section 1(D)(b) of the Adoption Act, in that Lorrie had "fail[ed] to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(b).
A hearing was held to determine whether Lorrie was an unfit parent on these grounds and to determine whether her parental rights should be forever terminated. Testimony was received from Lorrie, Mark, Brenda Syck (Mark's mother, who cared for Paul much of the time while Paul was in Mark's custody), and others. In order to judge the validity of the appellate court's Rule 23 order, it is essential that we review the relevant facts revealed by this testimony.
Paul was born on July 24, 1982; at this time, Lorrie was 16 years old and had a ninth-grade education, and Mark was 20 years old. For a time, Mark, Lorrie, and Paul lived in Germany, where Mark was stationed in the military service. At Mark's suggestion, Lorrie and Paul moved to Pennsylvania in August 1983; Mark joined *260 them in September 1983. After approximately one month, Mark left Lorrie and Paul and moved back into his parents' house in Peoria, Illinois. In a matter of a week or so, Lorrie called the Sycks in Peoria and asked Mark if he or his parents would send her some money so that she could care for Paul. When the Sycks refused to send her any money, Lorrie told Mark's parents that they would have to come and pick up Paul and care for him until she could "get on [her] feet and get a stable place for [her and Paul] to live." The Sycks agreed to care for Paul, but on a temporary basis only. According to Lorrie, when the Sycks arrived she told Brenda, Paul's paternal grandmother, that she would come and get Paul in a couple of months when she had a job and a place to live. Conversely, both Mark and Brenda testified that when Lorrie called she threatened to give Paul up if they did not come for him; Lorrie denied this. Mark and Brenda also did not recall Lorrie's saying anything about when she would be able to take Paul back.
Whether Lorrie wrote to the Sycks during the next five months, up until March 1984, Mark and Brenda could not recall when questioned, but they did recall her telephoning collect two or three times, which the Sycks "had to stop." Lorrie, on the other hand, testified that, sometime late in 1983, she wrote a letter to the Sycks stating that she had a job and would come and get Paul as soon as she found an apartment; Lorrie further testified that she later telephoned and told Brenda that she was coming to get Paul, but Brenda told Lorrie that Mark would not allow Lorrie to take Paul back. When Lorrie reminded Brenda that the Sycks had agreed to care for Paul for only a short time, Brenda said Lorrie would have to talk to Mark. This pattern of Lorrie's being able to talk only to Brenda, who said that she would have to talk to Mark and Mark would call Lorrie, continued for the next four years. Also in 1983, Lorrie sent *261 Paul a Christmas present and called the Sycks' house to wish Paul a merry Christmas, but Mark and Paul were not there.
In January 1984, Lorrie received notice that Mark had filed for dissolution of their marriage. In March, Lorrie arrived in Peoria and moved into the YWCA. She called the Sycks' house a number of times to find out where Mark and Paul were living, but Brenda merely took Lorrie's number and said she would have Mark call her. Later, Lorrie talked to Mark twice over the telephone, asking to see Paul; Mark refused, saying, on his attorney's advice, that any visitation should wait until after the dissolution proceedings. Lorrie also visited Mark's father's place of employment to ask him to intervene and get Mark's agreement to her seeing Paul; Mark's father declined. Brenda testified that Lorrie then threatened to "snatch" Paul. During this same time, Lorrie voluntarily admitted herself into an institution for treatment of alcohol and substance abuse problems she was having; she was successfully treated. While there, Lorrie called Brenda, who offered to visit Lorrie and did so twice, at Lorrie's request bringing Paul on the second visit.
On April 3, 1984, a judgment of dissolution of marriage, which incorporated a property settlement agreement, entered by the circuit court. In regard to custody of Paul, the judgment of dissolution stated that both Lorrie and Mark were "fit and proper persons to have custody of" Paul. Lorrie, though, voluntarily agreed that Mark should have custody because of her problems with drugs and because she did not have a home or a job at the time, whereas Mark and his parents could provide Paul a home. The property settlement agreement awarded Lorrie visitation on alternate weekends and alternate holidays and for three weeks during the summer; *262 neither parent was allowed to take Paul out of Illinois without prior court approval.
All the witnesses agreed that, during the next few months, Lorrie took Paul for visitation every scheduled time. The witnesses also agreed that when Lorrie took Paul for the three-week summer visitation in 1984, she returned Paul early (during the second week according to Lorrie, after the first week according to Brenda) because at that time she was employed as the live-in companion of an elderly Peoria woman, and Lorrie felt this woman was not treating Paul nicely and that Paul, who was then two years old, was not happy.
In the summer or fall of 1984, Lorrie discovered that the father she had never known was living in Pennsylvania, and she decided to visit him. Lorrie told Brenda that she would be gone for two weeks. Upon finding her father an impoverished alcoholic, however, Lorrie decided to assist him: She cashed in her return bus ticket to Peoria, moved in with her father, and got a job. Lorrie called Brenda to say that she would not be back for a while.
In fact, Lorrie did not return to Peoria until the hearing on the petition for adoption was held in August 1988. In the opinion of appellees, Mark and Lisa, Lorrie's manifestations of interest, concern, and responsibility for Paul's welfare during the intervening four years, especially her failure to see Paul, prove Lorrie to be an unfit parent.
Lorrie, Brenda, and Mark testified to the number of times Lorrie called the Sycks' house and the number of letters, cards, and gifts she mailed to Paul and to the Sycks from the time she left Peoria in 1984 until late 1987. Their memories as to the number of contacts were frequently cloudy, with Mark's memory being the vaguest, and their memories sometimes disagreed. It is undisputed, though, that when Lorrie called the Sycks' *263 house she almost invariably could talk to Brenda solely, talking to Mark only once and never to Paul.
In 1984, Lorrie testified, she telephoned the Sycks' house twice from Pennsylvania and talked to Brenda; when Lorrie told Brenda she would not be returning to Peoria for some time, Brenda told her that if she stayed away too long Mark would not allow her to see Paul; Lorrie also asked for a picture of Paul. She telephoned next on Christmas Day 1984, but there was no answer.
An important event in the relationship between Lorrie and Paul occurred in the spring of 1985 when Mark moved out of his parents' house with Paul. Mark admitted that he told his parents not to give Lorrie his new address or his telephone number; if she wanted to contact him she would simply have to do so through his parents. Lorrie asked Brenda many times for Mark and Paul's new address and telephone number, but Brenda always refused to divulge it, telling Lorrie that if Lorrie wanted to talk with Mark about something she would have Mark call Lorrie back. It turns out that during this entire time Mark's telephone number was either unlisted or listed under the name of his second wife, Lisa. Mark conceded that there was no way for Lorrie to discover his telephone number, owing to his instructions to his parents and to Lorrie's not being told of Mark's marriage to Lisa until January 1988. The consequence of Mark's actions was that the only address and telephone number which Lorrie had for communicating with Paul were those of Mark's parents, with whom Paul no longer resided.
Lorrie testified that in 1985 she telephoned four times, in March, June, and July, and on Christmas Day. In March, Lorrie asked Brenda for Mark and Paul's address, but Brenda refused to oblige; Lorrie also asked if she could come and visit Paul on his birthday, to which Brenda responded that Lorrie would have to talk to *264 Mark, and Brenda would tell Mark that Lorrie wanted him to call her. Lorrie never received a call from Mark. In June, Lorrie told Brenda that she was planning on taking a trip to Oklahoma (she never did) and would like to stop in Peoria and see Paul; Brenda told Lorrie that Mark would not allow her to see Paul. In July, Lorrie called and asked why Mark had not called her, and Brenda replied that Mark had said he would call when he had time; in response to Lorrie's request for pictures of Paul, Brenda said that would be Mark's decision. No one answered Lorrie's telephone call on Christmas Day 1985. Brenda, testifying regarding Lorrie's telephone communication in 1984 and 1985, was able to state only that, while Lorrie had telephoned and had asked about Paul a number of times, she could not recall how many calls there had been.
Lorrie next telephoned in January 1986; she asked where the Sycks had been on Christmas Day (they had taken Paul to Ohio) and asked about Paul and whether he had received her Christmas gift; she also said that she would like to visit in the summer, but Brenda again replied that Lorrie would have to talk to Mark about this, even though the last time Lorrie had asked Brenda to have Mark call her he had not done so. In a failed attempt to discover Mark's address in June 1986, Lorrie called Paul's paternal great-grandmother, who told Lorrie not to disrupt Paul's life. Around Paul's fourth birthday, in July 1986, Lorrie called and asked about Paul and told Brenda that Mark had still not returned her call and that she would like Mark's telephone number so that she could make arrangements to come and see Paul over Christmas; as ever, Brenda refused to reveal this information and said that she would give Mark the message. Lorrie's call on Christmas Day 1986 went unanswered. Brenda did not remember the 1986 telephone calls about which Lorrie testified, instead testifying that Lorrie had *265 telephoned only once, around October; at this time, Lorrie asked after Paul, requested pictures of him, related some of her personal difficulties, and said she would like to visit Paul around Christmas, which Brenda told her would be fine.
Lorrie testified that she had only one 1987 telephone conversation with Brenda, in March. Lorrie testified that she had called to find out where she could send Paul's Easter basket, but Brenda still refused to disclose Mark's address and told Lorrie to mail it to Brenda's house. At this time, Lorrie inquired about Paul, too, and asked if she could visit Paul. Brenda told Lorrie that she had been gone too long and Paul would not know her, that Paul had a new mother, and that Mark had said that when Lorrie came out to visit Paul they would have to go to court and alter the visitation agreement. Brenda related the content of only one telephone call in 1987, which she said occurred in October; yet Brenda conceded that there might have been more calls from Lorrie during 1987 and, in fact, later remembered that in early 1987 Lorrie telephoned once or twice and asked Brenda to have Mark call her. According to Brenda, in the October conversation Lorrie asked how Paul was and then told Brenda that she wanted to come and see Paul. Brenda replied that Lorrie had been gone so long that Paul would not know her "from a stranger on the street"; Brenda said that she did not think Mark would allow Lorrie to be alone with Paul or take him for any amount of time; and she asked how Lorrie could expect the Sycks to allow Paul to "go off with a stranger" when Paul had been told not to "talk to strangers." Lorrie also testified that during 1987 she telephoned the Sycks on Paul's birthday and at Christmas, but did not receive an answer.
There is confusion as to whether, during 1986 and 1987, Lorrie and Mark had either one or two telephone *266 conversations. Lorrie testified that she called the Sycks' house around December 1, 1986, and was able to talk to Mark, who told her that if she came to Peoria for Christmas she would be wasting her time because he was taking Paul out of State; Lorrie questioned how Mark could take Paul out of State when Lorrie could not do so (the custody agreement prohibited either parent from taking Paul out of Illinois without court approval); Mark also told Lorrie that if she ever came to visit Paul he would only allow her to see Paul under his close supervision; Lorrie responded that she could not afford to stay in a motel and see Paul only when it was convenient for Mark. While Lorrie testified that she and Mark talked a second time, in late 1987, at which time Mark told her that Paul had a new mother, Paul did not know Lorrie, and if Lorrie came to see Paul he would take Paul away, Mark recalled having only one conversation with Lorrie, and that in November 1987. Mark related that in this conversation he told Lorrie that she could not take Paul out of State for the three-week summer visitation, and, because it had been three years since Lorrie had seen Paul, if she visited Peoria he would allow her to see Paul only under his supervision; Mark denied receiving Lorrie's many messages to telephone her.
The next communication Lorrie had with the Sycks was when Mark called her in January 1988 and told her that he and Lisa were going to petition for the adoption of Paul, which would take away Lorrie's parental rights. When Mark asked Lorrie if she would consent to the adoption, she refused.
For the first time in almost four years, Lorrie talked to Paul on the telephone in June 1988, having obtained the telephone number of Lisa Syck from directory assistance. Lorrie asked Paul how he was, and told Paul who she was, that she would see him in August, and that she loved him; neither Mark nor Lisa was home at the time. *267 When she arrived in Peoria in August, Lorrie tried to arrange a visit with Paul to give him his birthday present, but Mark and his attorney denied her request.
From late 1983 until 1988 Lorrie also sent a number of gifts and cards to Paul, and wrote a number of letters to Brenda Syck. Though the memories of all the witnesses are unclear as to the exact number of letters, and the trial court did not make a detailed finding on this issue, the record shows that Lorrie contacted the Sycks by mail as follows. From Christmas 1983 until Christmas 1987, Lorrie mailed Paul a gift and a card every Christmas and on every one of Paul's birthdays; she also mailed an Easter card every year and sent at least one Easter basket. Interestingly, although Brenda and Mark testified that they gave Paul any gifts Lorrie sent, they stated that they did not tell Paul the gifts were from his mother, explaining only that they came from someone named "Lorrie" or a friend. Both Brenda and Mark conceded that, until sometime in 1987 when Mark showed Paul a picture of Lorrie and explained who she was, they never told Paul who "Lorrie" was or explained that he had a mother who was not living with them. Brenda also testified that Paul was never given the cards that came with the gifts because Paul could not read (nor does it appear that these cards were ever read to Paul by the Sycks).
At trial, a group exhibit was introduced that included five letters Lorrie wrote during 1985 and one from 1987, and also included one Easter card and one Christmas card. Lorrie had signed the cards "Mom" and had written in them that she loved and missed Paul. Lorrie testified that over the years she had mailed more letters than the six included in the exhibit: In 1985, she sent seven or eight letters; in 1986, she sent letters saying how much she loved Paul and asking for pictures of Paul; and, in 1987, she wrote another four letters to the Sycks with *268 similar language. Brenda admitted that Lorrie had sent more letters (maybe two or three more) and cards over the years, but said she had not kept them.
The 1985 letters from Lorrie addressed to Brenda, or Brenda and "Paul T.," express love and concern for Paul and interest in him and his life. In every letter, Lorrie asks Brenda to tell Paul that his mother loves him and misses him, and asks Brenda to give Paul hugs and kisses from his mother. Lorrie also asks Brenda to tell her if Paul wants or needs anything for his birthday or Christmas. She also frequently asks, almost pleads, for pictures of Paul and once asks for one of his colorings. (The 1987 letter from Lorrie was a short note asking for pictures of Paul.) In addition, Lorrie writes of her interest in what Paul was doing, discussing things that Brenda apparently had told Lorrie over the telephone, and says she is glad to hear that Paul is doing well. In a letter dated May 23, 1985, Lorrie writes: "I want to always keep in touch with Paul T. I know I may never get him back now, but I want him to know that I do love him and won't ever stop loving him. I want him to know when he gets older that I'm here for him and I won't turn him away like my mom did us!" Lorrie also includes the telephone numbers where she could be reached or a message left in case anything happened to Paul. As appellees point out, these letters also contain details of Lorrie's life and future plans.
Although in some of these letters Lorrie asks Brenda to keep in touch with her so that she would know how Paul was, it appears that, except for the 1987 telephone call when Mark told her she could see Paul only with Mark's supervision, and a letter from Mark mailed in April 1987, the Sycks never telephoned or wrote Lorrie. Mark's letter, which was admitted at trial, spells out the restrictions that Mark planned to impose on Lorrie's visitation with Paul if she came to Peoria: She could see *269 him "under close supervision by [Mark] and Paul's new mother" for 30 minutes the first day and an additional 15 minutes each day after that, but only on the first and third weekends of each month; she would not be allowed to take him for the three-week summer visitation; and, because Paul "knows only one mother now" and "does not know you from a stranger on the street," Mark would not allow Paul to call Lorrie "mom." Needless to say, these conditions were not included in the custody agreement. Mark's letter provided a telephone number where Lorrie could contact Paul: It was the telephone number of Mark's attorney.
During all these years Lorrie was in difficult financial straits. She had a ninth-grade education and could obtain only low-paying employment. In addition, she had committed herself to assisting her father in Pennsylvania. She was also spending money in an effort to obtain her GED certificate and certification as a licensed practical nurse, as well as paying all her other living expenses. The reason Lorrie did not personally visit Paul during these years, Lorrie explained, was that she could not afford to travel to Peoria and stay at a motel for many days. Lorrie admitted that from 1984 to 1987 she made a conscious decision to use the money she earned to care for her father and obtain an education, instead of seeing her son. And Lorrie confirmed that she never told the Sycks specific dates when she would visit. Moreover, Lorrie never claimed that one reason for her failure to visit Paul was the Sycks' hostility to such a visit; she did say, though, that if Brenda had told her that she could stay at the Sycks' house while visiting Paul (which Brenda said at the hearing would have been acceptable), Lorrie would have visited. At the time of the hearing, Lorrie was 22 or 23 years old.
The circuit court held that Mark and Lisa had presented clear and convincing evidence that Lorrie had *270 failed to maintain a reasonable degree of interest, concern, or responsibility as to Paul's welfare. While the circuit court did not make detailed findings of fact as to the communications Lorrie initiated with the Sycks and Paul over the years, the court generally acknowledged that she had sent many letters, cards, and gifts, had expressed intentions to visit but never had, and had suffered financial hardship. The court also recognized that the Sycks had done nothing to assist Lorrie, emotionally or financially, in visiting Paul, that they had cut off direct telephone and correspondence contact between Lorrie and Paul and Mark, that they had not told Paul about his mother, and that Brenda had actually discouraged Lorrie from visiting. Yet, the court concluded that Lorrie had initially created the situation in which she found that she was unable to visit Paul and unable to have any real contact with Paul owing to the Sycks' attitude. On this basis, the court found Lorrie to be an unfit parent, under section 1(D)(b) of the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(b)), who deserved to have her parental rights terminated, because "she by her own choice left the area and imposed the financial and distance difficulties upon herself in choosing to care for her father."
The appellate court affirmed, holding that the circuit court's finding of unfitness was not against the manifest weight of the evidence. Significantly, though, before considering the merits of the unfitness determination, the appellate court stated:
"We must first look to Paul's present well-being and his future in reviewing this decision. It is Paul, more so than any other party, who stands to benefit more or suffer more as a result of the trial judge's decision. After a complete hearing on this matter in the trial court, the trial judge obviously believed Paul's well-being and future would be better protected by terminating Lorrie's parental *271 rights, which eliminated any obstacle for Lisa's adoption of Paul. We agree with the trial judge's decision."
Justice Heiple dissented, stating that the circuit court's finding that Lorrie had failed to maintain a reasonable degree of interest in Paul's welfare was against the manifest weight of the evidence; furthermore, Justice Heiple stated that the appellate court had erred when, in deciding whether to terminate Lorrie's parental rights, it had first considered Paul's best interests.
It is on these facts that we now pass judgment on whether the trial court erred in finding that, from late 1983 until January 1988, when the petition for adoption was filed, Lorrie failed to maintain a reasonable degree of interest, concern or responsibility as to her son Paul's welfare.

ANALYSIS
Lorrie appeals from the appellate court's affirmance of the trial court's finding that there was clear and convincing evidence that she was an unfit parent, and she appeals from the affirmance of the trial court's order terminating her parental rights. Lorrie first contends that the appellate court failed to correctly apply the standard that requires clear and convincing evidence of a parent's unfitness in order to terminate that parent's parental rights. According to Lorrie, this failure to apply the proper evidentiary standard is evidenced by, as Justice Heiple's dissent points out, the appellate court's explicitly stating that it "must first look to Paul's present well-being and his future in reviewing this decision," and must look at the fact that once Lorrie's parental rights were terminated it would be possible for Mark and Lisa to adopt Paul, before the court perfunctorily mentioned the clear and convincing evidence standard and held that the finding of unfitness and termination of parental *272 rights in this case was not against the manifest weight of the evidence.
Lorrie's second contention is that, when the proper evidentiary standard is applied, it is apparent that there was not clear and convincing evidence of her unfitness. Lorrie asserts that her telephone calls and the cards, letters, and gifts that she sent to Paul and the Sycks manifested a reasonable degree of concern, interest and responsibility for Paul and, indeed, the letters that were admitted into evidence reveal her great love and affection for Paul. There are two factors to which Lorrie asks us to pay particular attention when determining whether her efforts over the years showed the requisite degree of concern: her poor financial position and the fact that it was the Sycks' actions that rendered her attempts to communicate with Paul futile. Lorrie asserts that the trial court wrongly concluded that her sending cards, letters, and gifts did not establish the requisite degree of concern because she should have realized that, given the Sycks' attitude toward her, "cards and letters to a child of this age would in essence have the practical effect of no contact at all in a maternal sense."
Attempting to persuade us that we should affirm the appellate court's holding, appellees, Mark and Lisa, argue that there was clear and convincing evidence that Lorrie was an unfit parent, and they rely on the principles of review that a finding of unfitness is to be reversed only if against the manifest weight of the evidence and that a trial court's findings should be given great deference because it is in the best position to evaluate the credibility of witnesses. (See In re Brown (1981), 86 Ill.2d 147.) Appellees stress that it is a parent's concern, interest, and responsibility as to the child's welfare that is critical under section 1(D)(b) (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(b)); a parent has to demonstrate more than merely love for, or a general interest *273 in, her child  a parent must show "concrete" concern for the child's welfare by providing the child with face-to-face counseling and economic support. In comparison, appellees characterize Lorrie's actions over the approximately four years at issue as "a paltry number of letters and cards" and telephone calls which might have taken, in total, 20 to 30 hours of her time and which would have been meaningless to a child growing from two to six years of age. Exhibition of real concern for Paul's welfare, according to appellees, would have required Lorrie to move back to Illinois and then give guidance and economic aid to Paul and make the sacrifices inherent in the role of a parent. Appellees also note that the evidence showed that it was Lorrie's financial condition that prevented her from visiting Paul, not any denial of visitation by the Sycks. (Not in her letters to the Sycks, nor in a letter she wrote to the circuit court when notified of the adoption proceedings, nor, as we found, in her hearing testimony, did Lorrie claim that the reason why she did not visit Paul was, in whole or in part, the attitude of the Sycks or any limitation that they placed on her visitation.) Regarding the appellate court's review of this case, appellees deny that the conclusion that the appellate court failed to properly apply the clear and convincing evidence standard is warrantable based on the appellate court's mere mention of Paul's well-being in its Rule 23 order. Other matters discussed by appellees, such as the reasons for Mark's maneuvers designed to prevent any direct communication between Lorrie and Paul, are irrelevant to our review.
In order to find that a parent is unfit under section 1(D)(b) of the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(b)), thereby avoiding the necessity of obtaining that parent's consent to the adoption of his or her child (In re Adoption of Burton (1976), 43 Ill. App.3d 294, 297), the trial court must find clear and convincing *274 evidence that the parent "fail[ed] to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." (See In re Paul (1984), 101 Ill.2d 345, 352, citing Brown, 86 Ill.2d at 152; In re Ybarra (1975), 29 Ill. App.3d 725, 729; In re Gibson (1975), 24 Ill. App.3d 981, 984; see also Peyla v. Martin (1976), 40 Ill. App.3d 373 (while there was some evidence of lack of concern by father, under circumstances of case  including mother's refusal to allow father to see infant and absence of order of court or request from mother for child support from father  there was not clear and convincing evidence of father's failure to maintain reasonable degree of interest, concern, or responsibility); cf. Ill. Rev. Stat. 1987, ch. 40, par. 1510(a)(1) (consent to adoption is required unless person whose consent would otherwise be required is found to be unfit by clear and convincing evidence).) The burden of presenting this clear and convincing evidence is upon those who have petitioned for adoption of the child  in this case, Mark and Lisa. In order to reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, a reviewing court has to conclude that this finding was against the manifest weight of the evidence. Brown, 86 Ill.2d at 152; Blakey v. Blakey (1979), 72 Ill. App.3d 946, 947.
In this case, all that has presently been decided is that Lorrie is an unfit parent and that her parental rights are terminated. The petition for adoption of Paul by Mark and Lisa has not yet been ruled upon. Therefore, all that we are to decide is whether the finding that there was clear and convincing evidence of Lorrie's parental unfitness was against the manifest weight of the evidence presented. We hold that it was.
Termination of parental rights destroys the parent-child relationship. The effect of a termination of parental *275 rights is made grimly clear by section 17 of the Adoption Act:
"After the entry either of an order terminating parental rights or the entry of a judgment of adoption, the natural parents of a child sought to be adopted shall be relieved of all parental responsibility for such child and shall be deprived of all legal rights as respects the child, and the child shall be free from all obligations of maintenance and obedience as respects such natural parents." (Ill. Rev. Stat. 1987, ch. 40, par. 1521.)
For instance, a parent whose rights are terminated no longer has a right to visitation with his or her child. Precisely because of the devastating effect produced by a termination of parental rights, the evidence of a parent's unfitness has to be clear and convincing. We now turn to the facts in the present case.
Although the appellate court expressly made reference to "the merits of the termination of a natural parent's parental rights," and touched lightly upon some of the areas of testimonial conflict, procedurally it incorrectly approached this matter. Prior to mentioning these matters, the appellate court stated that it "must first look to Paul's present well-being and his future in reviewing this decision" and did so. After deciding that Paul's present and future well-being "would be better protected by terminating Lorrie's parental rights, which eliminated any obstacle for Lisa's adoption of Paul," and after surmising that the trial court had reached the same conclusion, the appellate court proceeded to the apparently secondary matter of reviewing the evidence presented at the hearing on parental fitness. We cannot agree with appellees that the appellate court's statements about Paul's well-being were innocuous, or that it is clear that the court did not base its affirmance on this consideration and instead relied only on evidence relevant to Lorrie's parental fitness when it held that the *276 termination of her parental rights was not against the manifest weight of the evidence.
When ruling on parental unfitness, a court is not to consider the child's "best interests." (E.g., In re Jones (1975), 34 Ill. App.3d 603, 607-08.) "[W]here the rights and interests of a parent are sought to be permanently severed, the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance [citations]." (In re Massey (1976), 35 Ill. App.3d 518, 521.) Only evidence that bears on the issue of unfitness is to be considered, precluding evidence bearing on the child's "best interests" (see Burton, 43 Ill. App.3d at 299-302 (Adoption Act indicates legislature's intent that "a finding of parental unfitness necessarily precede consideration of the best interests of the child"; there is a two-step process of first ruling on parental unfitness and then, if called for, ruling on whether adoption is in child's best interests; in ruling on parental unfitness, all evidence of home life of petitioners is irrelevant)). At this point, it is the parent's past conduct in the then-existing circumstances that is under scrutiny. (Paul, 101 Ill.2d at 352-53; Culkin v. Culkin (1975), 30 Ill. App.3d 1073, 1074-75; Gibson, 24 Ill. App.3d at 984-86; In re Overton (1974), 21 Ill. App.3d 1014, 1019; see also In re Hrusosky (1976), 39 Ill. App.3d 954, 957-58 (unlike other cases cited therein where there were transportation difficulties, financial limitations, or discouragement of parent's visitation by State agency, here there was no valid excuse for mother's lack of effort to communicate with child).) The child's welfare and whether the child's eventual adoption by the petitioners would improve his future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent (Paul, 101 Ill.2d 345; Perkins v. Breitbarth (1981), 99 Ill. App.3d 135, 139; In re Cech (1972), 8 Ill. App.3d 642, *277 645-46); nor are these factors relevant in determining, as in this case, whether, in the past, the natural parent maintained a reasonable degree of concern, interest and responsibility as to the child's welfare. Only after a parent is found, by clear and convincing evidence, to be unfit does a circuit court ruling on an adoption petition proceed to consider the child's best interests and whether those interests would be served by the child's adoption by the petitioners, requiring termination of the natural parent's parental rights. (E.g., In re A.C.B. (1987), 153 Ill. App.3d 704, 708; Perkins v. Breitbarth (1981), 99 Ill. App.3d 135, 138-39; Gibson, 24 Ill. App.3d at 986; see also In re Shuman (1974), 22 Ill. App.3d 151, 153 (without parent's being found unfit, or consenting to adoption, court cannot grant adoption even if it would be in child's best interests); cf. Ill. Rev. Stat. 1987, ch. 37, pars. 802-29(2), (3) (Juvenile Court Act of 1987 provides court may appoint guardian with power to consent to minor's adoption if natural parents consent or "after finding, based upon clear and convincing evidence, that a non-consenting parent is an unfit person").) (In fact, at the hearing, appellees' counsel, in his opening statement, recognized that there would be two stages to the hearing on the petition for adoption, the first stage dealing solely with Lorrie's unfitness and, if that was decided favorably to petitioners, the second stage being a "best interest hearing" when termination of Lorrie's parental rights would be requested.)
We approve these holdings, and declare that when a petition for adoption alleges that a parent is unfit, abrogating the need for that parent's consent to the adoption, the trial court is initially to determine the parental unfitness, basing that determination on any evidence relevant to the particular grounds of unfitness alleged. At least when the grounds alleged are those alleged in the present case (failure to maintain a reasonable degree of *278 concern, interest or responsibility regarding the child's welfare), the prospective effect that the termination of parental rights and adoption of the child by the petitioners will have on the child (the child's "best interests") is not relevant to determining the nonconsenting parent's status as unfit.
Although it is not completely clear that the appellate court relied on its conclusion as to Paul's present and future well-being when it ruled on the correctness of the order finding Lorrie to be unfit, the analysis as expressed in the appellate court's Rule 23 order, upon which our review is based, creates a substantial probability that the appellate court did so err. After deciding that Paul's well-being would be best safeguarded by affirming the termination of Lorrie's parental rights, the appellate court proceeded to vaguely discuss the actual evidence at the hearing (as the court itself put it, "the merits of the termination"), to state the manifest weight of the evidence standard of review, and to conclude that the finding should be affirmed after comforting itself that its affirmance was justified because in three similar, though not identical, cases reviewing courts had upheld trial courts' findings of unfitness. Owing to the appellate court's apparent misunderstanding of its role, we disapprove its opinion. Still, we have to review the evidence before we can determine whether to reverse its holding and, consequently, to reverse the trial court's order terminating Lorrie's parental rights.
As we have already stated, in determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or *279 responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence (Gibson, 24 Ill. App.3d at 984; In re Deerwester (1971), 131 Ill. App.2d 952, 954), the parent's poverty (Paul, 101 Ill.2d at 352-53 ("[t]hat [the mother] herself has personal difficulties, including poverty ***, should not be overlooked")), the actions and statements of others that hinder or discourage visitation (see Culkin, 30 Ill. App.3d at 1073-74 (custodial parent denied visitation, demanded that he be present during any visitation, and moved to a distant State)), and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child (Paul, 101 Ill.2d at 353). If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. (See In re Adoption of Barker (1976), 37 Ill. App.3d 721; Overton, 21 Ill. App.3d at 1019 (although mother moved to another State with her paramour, hoping to start "a new life," there was not clear and convincing evidence of mother's failure to maintain reasonable degree of interest, concern or responsibility where her letters to Department of Children and Family Services showed concern for her children and Department discouraged her from visiting children).) Also, mindful of the circumstances in each case, a court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts. In re Drescher (1980), 91 Ill. App.3d 658, 664.
Each case concerning parental unfitness is sui generis, unique unto itself. (Perkins, 99 Ill. App.3d at 137.) In a case proceeding under section 1(D)(b) of the *280 Adoption Act, the issue is whether a parent maintained concern, interest and responsibility as to his or her child's welfare that, under the circumstances, was of a reasonable degree. To terminate a particular parent's parental rights, a court must find the negative of the proposition  it must find that there is clear and convincing evidence that such a level of reasonable interest and concern was not maintained. In the present case, we find that there was not clear and convincing evidence that Lorrie failed to maintain a reasonable degree of interest, concern, and responsibility as to Paul. The trial court's finding to the contrary is against the manifest weight of the evidence.
The number of telephone calls that Lorrie made, and the number of letters, cards, and gifts that she sent to Paul and the Sycks, under the circumstances of Lorrie's life and her relationship with the Sycks, in themselves refute appellees' contention that Lorrie failed to maintain a reasonable degree of interest and concern in, and responsibility for, Paul. While the sheer number of contacts will not always suffice to frustrate the establishment of clear and convincing evidence of unfitness, in this case the letters that were admitted into evidence, and the testimony of Brenda as well as Lorrie, reveal Lorrie's concern for Paul and interest in his life. We note that the Sycks refused to give Lorrie Paul's telephone number or address, thus preventing any direct communication between Lorrie and Paul, at least as long as she remained away from Peoria, Illinois. We also take into account Lorrie's difficult situation in life: her limited education and the restrictions that it put on her employment opportunities, her poor financial condition, her young age, and the absence of any substantial emotional support from family or friends. While such circumstances will not excuse a complete lack of communication with one's child, they do bear on the reasonableness of *281 the communication a parent maintains and the interest a parent demonstrates in his or her child.
The trial court seemingly accepted all of the evidence concerning Lorrie's letters, cards, gifts, and telephone calls (therefore, in our review of the trial court's order we are not contravening its findings as to the credibility of witnesses). Yet, the trial court felt that by choosing to move to Pennsylvania, making it more difficult for her to visit her son or directly contact him because she had to rely on the Sycks' cooperation, Lorrie had failed to maintain a reasonable degree of interest and concern for her son.
We disagree; under the circumstances we do not judge Lorrie so harshly; we do not conclude that Lorrie's decision to move to Pennsylvania and the consequent constraints that this move, and the Sycks' attitudes, placed on her ability to communicate with her son provide clear and convincing evidence that she failed to maintain a reasonable degree of interest, concern and responsibility for Paul and so is an unfit parent whose parental rights warrant termination. Contrary to the views of the trial court and appellees, to exhibit a reasonable degree of concern for Paul, Lorrie need not have moved back to Illinois even though she believed that Paul was being well taken care of by Mark and his parents. Furthermore, we disagree with appellees that Lorrie's failure to provide Paul any financial support evidenced her parental unfitness, for Lorrie was not under a court order to pay child support and was never requested to do so by Mark, assuming that she could have afforded it. See Perkins, 99 Ill. App.3d at 138-39.
In sum, regardless of whether the appellate court weighed Paul's best interests when determining whether the circuit court erred in finding that Lorrie was an unfit parent, we hold that there was not clear and convincing evidence of Lorrie's parental unfitness as defined by *282 section 1(D)(b) of the Adoption Act, and we thus hold that the trial court's order to the contrary is against the manifest weight of the evidence. Accordingly, we reverse both the appellate court judgment and the trial court judgment, which found Lorrie A. Snyder to be an unfit parent and terminated her parental rights.
Judgments reversed.