617 N.E.2d 377 (1993)
247 Ill. App.3d 104
187 Ill.Dec. 169
In re ADOPTION of J.R.G. (John Doe and Jane Doe, Petitioners-Appellees,
v.
Henry Terwedow, Respondent-Appellant).
No. 1-91-3209.
Appellate Court of Illinois, First District, Fourth Division.
May 28, 1993.
*378 Anne V. Swanson, of counsel, Naperville, for respondent-appellant.
Mandel, Lipton & Stevenson Ltd., Chicago, Richard A. Lifshitz & Carolyn E. Winder, of counsel, for petitioners-appellees.
Justice HOFFMAN delivered the opinion of the court:
Respondent, Henry Terwedow, biological father of JRG, appeals from an order declaring him an unfit parent under section 1(D) of the Adoption Act (Ill.Rev.Stat.1987, ch. 40, par. 1501(D)) (hereinafter "the Act"), terminating his parental rights, and finding that his consent to JRG's adoption was thus not required under section 8 of the Act (Ill.Rev.Stat.1987, ch. 40, par. 1510(a)(1), (3)).
JRG was born on December 22, 1989. His biological parents, respondent and Mary Ellen G., were unmarried and had lived together from October or November 1988 through April 23, 1989, when Mary Ellen moved out of their apartment. Four days after JRG's birth, Mary Ellen surrendered him to an agency for placement for adoption. That same day, the agency placed him in the custody of John and Jane Doe, the adoption petitioners in this case. The trial court later entered an interim order granting petitioners temporary custody of JRG.
On February 8, 1990, in the circuit court of Dupage County, respondent filed an initial petition for a declaration of paternity and for custody of JRG. In the petition respondent alleged he had not been notified of JRG's birth date or current whereabouts, but he believed Mary Ellen intended to put him up for adoption.
On March 6, 1990, John and Jane Doe filed a petition to adopt JRG. They alleged that the identity of the child's father was unknown but that he had abandoned JRG and was therefore unfit to retain control or custody of him.
On March 23, 1990, in the adoption proceeding, respondent filed another petition seeking a declaration of paternity and custody of JRG. He alleged that prior to the *379 filing of that petition he had been denied information about the child's date of birth, name, or whereabouts, despite having made diligent inquiries of Mary Ellen and her family. Respondent further alleged he did not become aware of the child's birth until January 1990, after which time he had promptly filed his initial paternity action. He claimed he had never received notice of the pending adoption proceedings.
The trial court subsequently ordered that Mary Ellen, JRG, and respondent submit to blood tests, and after those tests, the parties entered into a stipulation that respondent was the child's biological father.
On April 25, 1991, John and Jane Doe filed an amended petition for adoption, alleging, in relevant part, that respondent was an unfit parent because he failed to demonstrate a reasonable degree of interest or concern for JRG within the first 30 days of his life. As such, they alleged, respondent's consent was not required for JRG's adoption. Respondent filed his response to these allegations June 12, 1991, and trial commenced shortly thereafter.
The following relevant evidence was adduced collectively from the hearings in this case. Respondent testified that he first met Mary Ellen in the summer of 1988 and commenced living with her in October or November of that year. Between March 23 and April 3, 1989, respondent was in England taking college courses. Sometime after his return, he and Mary Ellen began experiencing difficulties in their relationship. These difficulties culminated in an "altercation" between them on April 23, 1989, which caused Mary Ellen to move out of the residence and terminate the relationship. According to Mary Ellen's testimony, respondent had become very physically abusive during this incident, throwing an ashtray in her face and then repeatedly hitting and biting her. Mary Ellen went to the emergency room for treatment and later obtained an order of protection against respondent which took effect in May 1989.
In May 1989, Mary Ellen first learned she was pregnant. Respondent testified that he was first informed of the pregnancy in either May or June 1989 during a telephone conversation with Mary Ellen's mother. During the summer of 1989, respondent and Mary Ellen met three times in public places to discuss their situation. Both parties testified regarding the substance of their discussion at these meetings and their testimony conflicted in several crucial respects. There was no dispute that respondent had asked Mary Ellen how the pregnancy was going at least once. According to Mary Ellen's testimony, she had informed respondent no later than June 1989 that she planned to give the child up for adoption. She testified that respondent had not expressed any desire to keep the child either at the June 1989 meeting or thereafter; to the contrary, he told her he did not want to be responsible for a child, and at one point, became upset when she broached the subject of her pregnancy.
Respondent, on the other hand, testified that there was some discussion about joint relationship counseling during the meetings, and he had asked Mary Ellen to resume living with him so they could raise the child together. However, she told him there was no chance of this. He stated that Mary Ellen had provided a detailed explanation of the progress of her pregnancy, describing all about her doctor's examinations. When he asked her the child's due date, however, she told him she did not know. They did not discuss the question of the child's paternity because respondent was certain he was the father, although he admittedly did not verify this fact with Mary Ellen.
Respondent admitted that he and Mary Ellen did not discuss who would bear the responsibility for caring or providing for the child. Nor did respondent make any offers during these meetings to provide financial assistance to Mary Ellen, or to pay the medical expenses associated with her pregnancy or the child's birth. After the three meetings, respondent did not see or talk to Mary Ellen again until February 1990.
Aside from the meetings, respondent testified that he endeavored to communicate with Mary Ellen through her father, who *380 was a teaching assistant at the college respondent attended, and through a mutual friend, Meed Simon. Specifically, respondent made two cassette tapes for Mary Ellen, one in August and one in November 1989, and asked either her father or Simon to deliver them to her. Respondent testified that the first cassette consisted of "a few pleas to reconsider her having moved out [and] terminating the relationship * * * but most of it was a few songs that had been meaningful" to the couple. In the second tape, respondent allegedly asked Mary Ellen again to reconsider the breakup, but also to consider raising the child "in tandem" if reconciliation was impossible. Respondent admitted that he had retained a copy of the second cassette for himself; however, he did not offer either tape into evidence.
Additionally, respondent stated that in August or September he had asked Simon to tell Mary Ellen that respondent would pay all her medical expenses plus $1000 if she would "turn the child over" to him. He testified that this offer, which he also proffered to Mary Ellen's father, was contingent upon Mary Ellen giving the child to respondent. Respondent never received any response from Mary Ellen to this offer or to his other communications.
Respondent testified that in late November, Mary Ellen's father informed him that the child was expected in late December 1989. In early December 1989, respondent contacted an attorney for advice regarding his rights as the child's putative father. Respondent also called a local hospital two times trying to ascertain whether the baby had been born there, but was told he would not be given any information unless his name was on the birth certificate. On January 16, 1990, a friend called respondent and told him that the baby had been born December 22, 1989. This prompted respondent to file the February 8 paternity action.
Respondent admitted he never paid any medical expenses for Mary Ellen or for the child. Respondent also admitted that he had never provided any money for support of the child.
Mary Ellen testified that when she signed the adoption consent, she had informed the adoption agency that she did not know who the father was because she believed at that time that he was either respondent or Patrick M., a friend with whom she had intercourse several times in March 1989 while respondent was in England. Mary Ellen stated that she never personally informed respondent of the child's birth; she had discontinued all contact with him because he had been physically and verbally abusive.
On June 28, 1991, the court entered an order finding that respondent was an unfit person because, inter alia, he had failed to demonstrate a reasonable degree of concern for JRG under section 1(D)(1) of the Act and thus terminated his parental rights. The court also ruled that respondent's consent to the adoption was not required pursuant to section 8. Respondent's motion to vacate this order was denied August 7, 1991, and a judgment order of adoption was entered on behalf of petitioners on August 8, 1991. Respondent now seeks reversal of the orders of June 28 and August 7, 1991.
Respondent first contends that John and Jane Doe failed to prove him unfit under section 1(D)(1). He maintains that his efforts to show interest and concern for JRG, both prior to and after his birth, were frustrated to a great extent by Mary Ellen's conduct. Thus, his fitness as a parent should be evaluated based upon the extent of his efforts to express concern rather than their success.
Initially, we note that it is not this court's function to substitute its judgment for that of the trial court as to questions of fact. In adoption cases, evaluation of the witness' credibility and the inferences to be drawn from their testimony is for the trier of fact, who is in the best position to observe the conduct and demeanor of the parties and witnesses as they testify. (In re C.C. (1991), 224 Ill.App.3d 207, 215, 166 Ill.Dec. 540, 586 N.E.2d 498; In re Jones (1975), 34 Ill.App.3d 603, 608, 340 N.E.2d 269.) A finding of parental unfitness cannot be reversed by this court unless it is *381 against the manifest weight of the evidence. In re Adoption of Syck (1990), 138 Ill.2d 255, 274, 149 Ill.Dec. 710, 562 N.E.2d 174.
In the case at bar, it is apparent that the trial court elected to believe the testimony of Mary Ellen, which established that respondent had made it clear from the beginning that he wanted no responsibility for the expected child. The only competent evidence to the contrary in the record was respondent's own uncorroborated testimony as to his statements to Mary Ellen, which the trial court was free to either accept or reject. In light of this, we cannot say that it was encumbent upon Mary Ellen to keep respondent informed as to the progress of her pregnancy or JRG's birth. Additionally, although respondent testified that there was some reference to the child in a cassette tape he made for Mary Ellen, he failed to produce this cassette as evidence. While respondent readily endeavored to send messages to Mary Ellen through mutual friends, there is no evidence that he ever inquired about his son's welfare after his birth or that he sent gifts or cards to the baby through those friends. Indeed, we find it highly significant that, although, by respondent's own admission, Mary Ellen's father informed him of the child's due date over one month in advance, respondent failed to file any action to assert paternity until over one month after the child's birth. Based upon the foregoing, we cannot conclude that the trial court's findings of respondent's unfitness were contrary to the manifest weight of the evidence.
A parent may be declared unfit under section 1(D)(l) of the Act if he or she "fail[ed] to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth." (Ill. Rev.Stat.1987, ch. 40, par. 1501(D)(l).) The burden of proving such unfitness lies with the parties petitioning to adopt the child. (Syck, 138 Ill.2d at 274, 149 Ill.Dec. 710, 562 N.E.2d 174.) Because a finding of unfitness will operate to permanently sever a parent-child relationship, it must be based upon clear and convincing evidence. See Syck, 138 Ill.2d at 274-75, 149 Ill.Dec. 710, 562 N.E.2d 174; In re Woods (1977), 54 Ill.App.3d 729, 733-34, 12 Ill.Dec. 342, 369 N.E.2d 1356.
When determining the issue of parental unfitness, a court is not to consider the child's "best interests," but must restrict its focus to evidence bearing upon the responding parent's conduct. (Syck, 138 Ill.2d at 276, 149 Ill.Dec. 710, 562 N.E.2d 174.) Evidence of best interests is appropriate only after a finding of unfitness has been rendered, within the context of adoption proceedings. (Syck, 138 Ill.2d at 276-77, 149 Ill.Dec. 710, 562 N.E.2d 174.) Each case concerning parental unfitness is sui generis, and must be decided in accordance with its particular facts and circumstances. Syck, 138 Ill.2d at 279, 149 Ill. Dec. 710, 562 N.E.2d 174.
The evidence in the case at bar conclusively establishes that, within the 30-day period following the child's birth, respondent did nothing to manifest concern, interest, or responsibility as to his child's welfare. Indeed, we are fully cognizant of Mary Ellen's evasive conduct in the months preceding the child's birth, and of the fact that she failed to inform the adoption agency of respondent's identity as a possible father. However, respondent's contentions on this issue are unavailing under the circumstances of this case.
As can be readily observed, the legislature, in enacting section 1(D)(l), has imposed quite an exacting burden upon natural parents in a position such as that of respondent. Nonetheless, that burden is unequivocal, and requires that a parent affirmatively show a commitment to his child within 30 days of birth in order to ensure that proper provisions can be made for the child's permanent placement, if necessary, as soon after birth as is reasonably possible.
Notwithstanding respondent's assertions to the contrary, there were steps he could have taken in this case to demonstrate concern for his child. Despite the fact that he was aware of Mary Ellen's pregnancy in *382 May or June of 1989 and that he was certain he was the child's father, he failed to file a paternity action until February 8 of the following year, approximately six weeks after the child's birth. Section 7 of the Act (Ill.Rev.Stat.1987, ch. 40, par. 2507) explicitly permits the filing of such action prior to a child's birth as well as afterward by "a man presumed or alleging himself to be the father of the child or expected child." The filing of such action establishes the alleged father's status of record and entitles him to service of process in proceedings involving the child. (See Ill.Rev. Stat.1987, ch. 40, par. 2507(e).) Had respondent simply availed himself of the provisions of this section, he would not have had to rely upon the cooperation of Mary Ellen and her family, which he was aware was unreliable, to express his concern for his child.
In light of our ruling on this issue, we need not and do not reach the alternative basis for unfitness as stated by the trial court.
Respondent finally argues that the court improperly found that his consent to the adoption of the child was not required, under Section 8(a)(1) and (3) of the Act. Our holding above also disposes of this issue.
A finding of parental unfitness under Section 1(D)(l) of the Act avoids the necessity of obtaining that parent's consent to the adoption of his or her child. (Ill.Rev. Stat.1987, ch. 40, par. 1510(a)(1); see Syck, 138 Ill.2d at 273, 149 Ill.Dec. 710, 562 N.E.2d 174.) Because respondent was specifically found unfit, his consent was not required to the child's adoption in this case and his parental rights were properly terminated.
For the foregoing reasons, the decision of the trial court is affirmed.
Other circumstances of this case compel further comment by this court. This child was born three and a half years ago and the litigation giving rise to this appeal commenced two and a half months after his birth. The resolution of this case through the present juncture has taken three years.
The well-being of very young children such as JRG, who undergo the process of growth and development on a daily basis, makes this pace unacceptable. The judicial system at both the trial and appellate levels and its allied agencies must address this problem in an effort to prevent its repetition.
Affirmed.
JIGANTI, P.J., and CAHILL, J., concur.