NOTICE
Decision filed 01/17/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220588-U

NO. 5-22-0588

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

## APPELLATE COURT OF ILLINOIS

## FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* H.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-70 |
| | ) | |
| Jakob C., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the trial court's orders finding that Jakob C. was an unfit parent and that the best interest of the minor child warranted termination of his parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2                                        I. BACKGROUND

¶ 3    H.C. is a female child born on October 31, 2013. H.C.'s mother is Rhiannon W., and her father is Jakob C.[1] This case began with a report on April 14, 2020, that involved the care that

---

[1]This case only involves H.C. and her father, Jakob. Jakob and Rhiannon surrendered their parental rights to another child prior to this case.

1

H.C. was receiving from her paternal grandparents.[2] The Department of Children and Family Services (DCFS) investigated and determined that there was insufficient evidence of neglect or abuse.[3] However, by interviewing the grandparents, DCFS learned that Rhiannon refused to provide the grandparents with guardianship. Without guardianship, the grandparents had no ability to obtain medical care for H.C. The grandparents reported that Rhiannon periodically picked up H.C. and would keep her for two to three days at a time.

¶ 4    DCFS's investigation revealed that Rhiannon was homeless and living in random "drug houses," and that she had been arrested on March 30, 2020, for possession of methamphetamine. H.C.'s father, Jakob, was in California and was reportedly in a drug rehabilitation facility.

¶ 5    On May 8, 2020, the State filed a petition for adjudication of wardship. The petition alleged that that H.C. was neglected in that she was in an environment injurious to her health (705 ILCS 405/2-3(1)(b) (West 2018)) and that she was neglected in that she was under the age of 18, and was not receiving the proper or necessary support or education as required by law, and also was not receiving medical or remedial care mandated by State law and required for her well-being (*id.* § 2-3(1)(a)). The court held the shelter care hearing on the same date. The court granted DCFS temporary custody of H.C. As Jakob and Rhiannon could not be located, the State served both by publication notifying the parents of the upcoming adjudicatory hearing date.

¶ 6    Jakob appeared at the court hearing on February 3, 2021. The court entered a denial of the allegations of the adjudicatory petition on Jakob's behalf, appointed an attorney to represent him, entered an order requiring Jakob to submit to a DNA test to establish his paternity of H.C., and

---

[2]From a dispositional report DCFS filed later in this case, it appears that H.C. was initially residing with Rhiannon's father and his wife—not with her paternal grandparents.

[3]DCFS contracted with an agency, the Center for Youth and Family Solutions, to provide services to the parents in this case. The caseworker and supervisor were employed by this agency. For continuity in this order, we refer to the entity in charge of the case involving H.C. as DCFS.

continued the adjudicatory hearing to April 7, 2021. The trial court directed Jakob to work with his appointed attorney, who was in the courtroom at the time of his appointment, and to speak with DCFS workers who were also present in the courtroom.

¶ 7    At the adjudicatory hearing on April 7, 2021, Jakob stipulated to the second count of the State's petition for adjudication. He informed the court that he was 26 years old, lived in Tilton, Illinois, and had obtained his GED after dropping out of high school after the tenth grade. In exchange for his admission of neglect, DCFS agreed not to file a petition to terminate his parental rights for at least nine months after entry of the court's adjudicatory order so long as Jakob maintained regular contact with DCFS. At the conclusion of the hearing, the court found that the allegations of the State's adjudicatory petition had been proven by a preponderance of the evidence.

¶ 8    DCFS filed its dispositional report on June 3, 2021. In this report, DCFS provided the information it received from an unnamed reporter at the beginning of H.C.'s case. The reporter stated that H.C. was living with Rhiannon's father and the father's girlfriend. The reporter stated that H.C., who was then six years old, was not potty-trained. The reporter stated that the girlfriend said that they could no longer care for H.C. H.C. had not yet been enrolled in school. DCFS indicated that Jakob was the purported biological father of H.C. and requested that he complete the following tasks: (1) complete a substance abuse assessment and follow recommendations, (2) participate in random drug testing, (3) obtain a stable living arrangement, (4) complete a parenting assessment and follow recommendations, and (5) engage in visitation with H.C.

¶ 9    DCFS filed another dispositional report on August 18, 2021. H.C. was in a relative placement and was doing well. Jakob was working for his mother in her at-home daycare. He was scheduled for a substance abuse assessment later in August 2021. He had thus far tested negative

on drug tests. Jakob had missed his parenting assessment. He had engaged in visits with H.C. but had also missed several visitation opportunities. DCFS reported that Jakob's visits with H.C. went well. DCFS maintained its service recommendations for Jakob and asked the court to keep H.C. in foster care for 12 months.

¶ 10    The next dispositional report prepared by DCFS was filed on September 7, 2021. As of that date, Jakob was employed with Mervis, a recycling business. He was living in a two-bedroom apartment with his mother. His August 9, 2021, random drug test was negative. Jakob continued to struggle with consistency with visitation. Jakob's service plan included securing and maintaining employment and housing, attending a substance abuse assessment and any recommended treatment, attending a parenting assessment and engaging in parenting classes, random substance abuse testing, and continued engagement in visitation with H.C. Jakob missed his scheduled substance abuse and parenting assessment appointments. DCFS advised him to call "New Directions" to reschedule the appointments.

¶ 11    On September 10, 2021, the trial court held the dispositional hearing and entered its order. Jakob was present with his attorney. The court ordered Jakob to submit to a drug test on that date, and the results were negative. At the hearing, Jakob's attorney informed the court that "New Directions" could not work Jakob in for appointments until November 2021, and that he also intended to contact "Rosecrance" to see if he could obtain earlier appointments. At the conclusion of the hearing, the trial court found that Jakob was unfit and unable to care for, protect, train, educate, supervise, or discipline H.C., and that placement with Jakob was contrary to H.C.'s health, safety, and best interest because "of his need to complete a substance abuse assessment and follow all recommendations, engage and complete parenting education[,] and demonstrate sobriety and

4

stability to parent his child." The court granted the State's petition, adjudicated H.C. neglected, and made her a ward of the court and placed guardianship with DCFS.

¶ 12    DCFS filed its next permanency court report on December 10, 2021. Jakob and his mother continued to live in the two-bedroom apartment. DCFS inspected the apartment and found that it was an appropriate home for H.C. DCFS scheduled two random drug tests since the last report. Jakob tested negative on one test and missed the second test. Jakob was scheduled for a parenting assessment on December 7, 2021, at "Family Advocacy Center," but DCFS was unaware if he had completed the assessment. Jakob was also scheduled for a substance abuse assessment on December 23, 2021. Jakob continued to engage in visitation with H.C. showing appropriate parenting techniques.

¶ 13    The court held its permanency review hearing on December 15, 2021. Jakob was present for the hearing. Jakob's attorney reminded the trial court that Jakob had never tested positive on any court-ordered or DCFS random tests he took. However, Jakob claimed he did not know that he was required to call the drug testing system to see if he had been selected for a test. In response, the State stated that Jakob's claim that he was unaware that he needed to call the drug testing system each day was not credible. The court found that Jakob had made reasonable efforts, but not reasonable and substantial progress toward returning the minor home, and ordered him to have the DNA test, obtain employment, and comply with the service plan recommendations.

¶ 14    DCFS filed its next permanency report on March 30, 2022. DCFS reported that Jakob reported recent employment with Beef House Restaurant in Covington, Indiana, that he continued to live in the appropriate two-bedroom apartment with his mother, that he did not show for or reschedule the December 7, 2021, parenting assessment or his December 23, 2021, substance abuse assessment, and that he had been scheduled for six drug drops since the last court hearing,

but that he only showed for two of the six tests. He was negative on the two tests he took. He continued to engage in his weekly visitation with H.C. Jakob reported to DCFS that despite missing the random drug tests, he was living a sober lifestyle.

¶ 15 Jakob failed to appear at the March 30, 2022, permanency hearing. His attorney informed the court that Jakob was ill and would not be able to attend. The State reported that Jakob missed the DNA test because the testing date "slipped his mind." The State called Stephanie Jones, a caseworker employed by the Center for Youth and Family Solutions, an agency contracted by DCFS. Jones was assigned to this case. She testified that Jakob engages in visitation with H.C. about 75% of the time. Jones testified that the relative foster placement was willing to provide permanency for H.C. through adoption. H.C. and her younger brother, O.G.,[4] were both in the same foster family—the home of their maternal great aunt and uncle. The State and the guardian *ad litem* asked the trial court to change the permanency goal to substitute care pending termination of the parents' rights. The trial court agreed and entered its order finding that Jakob had not made reasonable efforts or reasonable and substantial progress toward return of H.C.

¶ 16 On April 5, 2022, the State filed its petition to terminate. The petition alleged that Jakob was an unfit parent for the following three bases: (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to H.C.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) he had failed to make reasonable efforts to correct the conditions that were the basis for H.C.'s removal within the specific nine-month period from July 5, 2021, to April 5, 2022, following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) he had failed to make reasonable progress toward the return of H.C. during the nine-month period from July 5, 2021, to April 5, 2022, following the adjudication of neglect (*id.* § 1(D)(m)(ii)). Jakob was served with the petition to

---

[4]H.C. and O.G. had the same mother, Rhiannon, but different biological fathers.

terminate and the notice of hearing on April 10, 2022, by a deputy of the Vermilion County Sheriff's Office.

¶ 17 DCFS filed its March 23, 2022, Family Service Plan on May 12, 2022, in anticipation of the fitness hearing. The period covered by this service plan was March 30, 2022, though October 31, 2022. Caseworker Stephanie Jones evaluated the permanency goal as not having been achieved. As of the date of the report, Jakob continued to live in the apartment with his mother and was then employed with Red Lobster Hospitality, LLC. Jakob had completed his integrated assessment earlier in the case. DCFS's requirement that Jakob live a sober lifestyle mandated that he complete a substance abuse assessment, engage in any treatment determined necessary, and test negative on all random drug tests. Jakob was rated unsatisfactory on this permanency plan outcome because he did not complete the substance abuse assessment. However, DCFS noted that when he appeared for his random drug tests, the results were consistently negative. Jakob was also required to provide appropriate parenting for H.C. To satisfy that requirement, he needed to complete a parenting assessment and complete any necessary parenting classes. Jakob was rated unsatisfactory on this permanency plan outcome because he did not complete a parenting assessment. Jakob was required to prove a safe home for H.C., which included both housing and income. DCFS had determined that the apartment Jakob shared with his mother was adequate for H.C.'s needs. As Jakob was currently employed, he had achieved the income aspect of this permanency plan objective.

¶ 18 The fitness hearing was held on July 1, 2022. Jakob did not appear at the hearing but was represented by his attorney. The State called two DCFS witnesses.

¶ 19 The first witness called by the State was Cassandra Carter, the supervisor and case manager for DCFS. Carter testified that she handled the case from its inception until June or July of 2021,

7

when the case was handed over to Stephanie Jones. Jakob completed the integrated assessment packet sent to him by Carter. Carter testified that based upon the information he included in this assessment, she recommended services for substance abuse and parenting. She also recommended visits with H.C. and a DNA test to establish parentage. Carter testified that Jakob was required to obtain and maintain adequate housing and employment. Carter stated that she referred Jakob for a substance abuse and parenting assessments in early 2021, and that she made the initial appointments for him. She testified that he completed the DNA test.[5] During the time that Carter managed this case, Jakob did not complete the substance abuse or parenting assessments. She testified that his housing was appropriate, but that his employment was not consistent. Carter testified that Jakob was allowed weekly supervised visits with H.C., but that he only attended approximately one visit each month during her involvement with his case. Carter stated that Jakob's visits with H.C. went well. Jakob maintained contact with DCFS, and he tested negative on all court-ordered drug tests. However, Carter indicated that DCFS never got close to returning H.C. to Jakob's care because his visitation was inconsistent and he had not completed the mandatory assessments.

¶ 20   The second witness called by the State was Stephanie Jones, who took over as Jakob's caseworker in July 2021. She recommended the same services for Jakob as her predecessor. Jones testified that Jakob failed to engage in the recommended services for substance abuse and parenting. He participated in the random drug testing and was negative on the two tests he took. However, he missed five of the seven tests ordered. Jones testified that his failure to show for most of the mandated drug tests was concerning because of Jakob's sobriety permanency goal. Jones

---

[5]Although the DNA test result is not included in the record on appeal, the result presumptively established that he was H.C.'s biological father.

indicated that housing was stable, but that he had worked for four to five employers, and so income was not stable. Overall, Jones testified that Jakob failed to comply with his service plan. She testified that Jakob participated in 27 of 50 scheduled weekly visits with H.C. and that the visits went well. Jones indicated that she had not had contact with Jakob since March 2022, and before that, she interacted with him approximately once per month. Since March, Jones testified that she had phoned and texted Jakob multiple times, and she mailed him one letter. Jakob responded to none of these contacts.

¶ 21    At the conclusion of the hearing, the trial court found that the State established by clear and convincing evidence that Jakob was an unfit parent. The court stated that Jakob had not made reasonable efforts or reasonable progress toward reunification with H.C. The court entered its written order on July 18, 2022, confirming the court's verbal findings at the conclusion of the July 1, 2022, hearing.

¶ 22    The court held the best interest hearing on August 25, 2022. Jakob did not appear but was represented at the hearing by his attorney. The only witness to testify was caseworker Jones. Jones testified that Jakob's last visit with H.C. was on March 15, 2022. Since that date, Jakob had not sent any cards, gifts, or letters to her. H.C. had been in her relative placement with her maternal great aunt and uncle since May 18, 2020. Her younger brother, O.G., was placed in the same home on February 9, 2021. H.C. was almost nine years old and had expressed her desire to stay in her current placement. Jones testified that H.C. was happy in this home. H.C. received counseling services and was seeing a psychiatrist for medication. H.C. had a history of anger outbursts, and the services were designed to address those behavioral and emotional needs. Jones testified that both children are loved and cared for in this placement and bonded with their foster parents. The foster parents had indicated a willingness to provide permanence by adoption of both children. On

cross-examination, Jones testified that Jakob apparently ceased his communications with her because she had informed him that the case was heading toward a potential termination of his parental rights. She testified that he contacted her a couple of weeks prior to the best interest hearing, and she advised him that he could still have visitation with H.C. However, he never responded to set up a visit with H.C. Jones confirmed that H.C. occasionally asks about Jakob's absence.

¶ 23    At the conclusion of the best interest hearing, the trial court found that the State established by a preponderance of the evidence that termination of Jakob's parental rights to H.C. was the appropriate outcome. In reaching this conclusion, the court listed the following statutory factors it considered in the context of H.C.'s age and developmental needs:

(1) her physical safety and welfare;

(2) the development of her identity;

(3) her background and ties, including familial ties;

(4) her sense of attachment, including where she actually feels love, attachment, and a sense of being valued; her sense of security; her sense of familiarity; the continuity of affection for the child; and the least disruptive placement for the child;

(5) her wishes;

(6) her community ties;

(7) her need for permanency, which included her need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(10) the uniqueness of her situation;

(11) the risks attendant to entering and being in substitute care; and

(12) the preferences of the persons available to care for her.

The court then ordered that H.C. shall remain a ward of the court, terminated Jakob's parental rights based upon the findings of unfitness, and appointed DCFS as the guardian and custodian of H.C. with the authority to consent to her adoption without further notice to or consent by Jakob. On September 1, 2022, the trial court entered its detailed written order finding that it was in H.C.'s best interest to terminate Jakob's parental rights.

¶ 24                                      II. ANALYSIS

¶ 25      Jakob appeals from the trial court's orders finding that he was an unfit parent and that his parental rights should be terminated.

¶ 26      The legal authority for the involuntary termination of parental rights in Illinois is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (citing *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The procedural basis for the involuntary termination of parental rights is found in section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2020)). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2020); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2); *In re J.L.*, 236 Ill. 2d at 337-38.

¶ 27      On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). The trial court's finding of unfitness is given great

deference because the court had the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 28    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Jakob was an "unfit person." The trial court determined that the State met its burden of proof on the following basis: (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to H.C.'s welfare (750 ILCS 50/1(D)(b)); (2) he had failed to make reasonable efforts to correct the conditions that were the basis for H.C.'s removal within the specific nine-month period from July 5, 2021, to April 5, 2022, following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) he had failed to make reasonable progress toward the return of H.C. during the nine-month period from July 5, 2021, to April 5, 2022, following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 29    Jakob argues that the trial court erred in finding that he was an unfit parent because he demonstrated sobriety by engaging in substance abuse rehabilitation while he lived in California and because he tested negative on the drug tests he took during the pendency of this case. He also argued that he established his fitness as a parent because he completed his integrated assessment form, maintained a stable home life, and was employed. Finally, he contends that his visits with H.C. established his parental fitness. Jakob claims that the trial court's conclusions—that he was

unfit for not having a sufficient interest in H.C.'s welfare and failing to make reasonable progress and reasonable efforts toward reunification—were erroneous.

¶ 30    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 31    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 32    We review Jakob's progress pursuant to the standard that includes the parent's compliance with the service plan objectives and the court's orders. *In re C.N.*, 196 Ill. 2d at 216-17. Here, Jakob could not be located when the case began in April 2020, and he did not make an appearance in this case until February 2021. H.C. had been in foster care for approximately 10 months before Jakob made his first court appearance and was directed to work with DCFS. Jakob was presented

with an integrated assessment packet which he completed. However, the information Jakob reported in this assessment required him to participate in both a substance abuse and a parenting assessment. If additional services were recommended after the individualized assessment, then Jakob was required to complete those services as well. Jakob never completed the assessments, and thus no services were ordered. Although DCFS never reached the point of requiring Jakob to complete specific services, that does not mean that Jakob was compliant or showed reasonable progress or effort. Jakob was required to call into the random drug system daily to determine if he had been selected for a drug test. Jakob's negative results, both when ordered by the trial court during hearings and through the random testing program, reflected that on those dates he was not under the influence. More problematic was the number of random drug tests that Jakob missed. As DCFS caseworker Jones testified at the fitness hearing, missing a random drug test was concerning because he was required to demonstrate that he was maintaining a sober lifestyle. What is not known is whether Jakob purposefully skipped the drug test because he knew he would test positive. However, missed random drug tests, without some sort of verified excuse, could be treated as presumptive positive tests. At the very least, missing a multitude of drug testing opportunities reflects Jakob's lack of commitment to the process. Additionally, Jones testified that Jakob missed almost 50% of his weekly visits with H.C., and he never consistently maintained employment.

¶ 33    Accordingly, we find no basis in the record on appeal to conclude that the trial court's determination that Jakob was an unfit parent was in error. We conclude that the trial court's finding that Jakob was an unfit parent was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 34    Having determined that the trial court correctly found that Jakob was an unfit parent, we turn to the best interest of H.C. Termination of a parent's rights is an extreme act. *In re Adoption*

14

*of Syck*, 138 Ill. 2d 255, 274-75 (1990). A parent maintains a superior right to raise his or her own children. *Id.* Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. Until the court determines that a parent is unfit, the interests of both the parent and the child are concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 35    After finding that a parent is unfit, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. On appeal of a best-interest determination, we must decide whether the trial court's decision is contrary to the manifest weight of the evidence. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 36    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). The trial court may also consider the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

15

¶ 37    During the best interest hearing, the trial court stated that it had considered all statutory best interest factors (705 ILCS 405/1-3(4.05)) and found that H.C.'s security and familiarity, continuity, and the need for permanence were paramount. The court concluded that in consideration of all factors, H.C.'s best interest could only be met by termination of Jakob's parental rights. The record indicates that Jakob last saw H.C. in March 2022. Although he was offered the right to continue his weekly visits, he declined that opportunity. H.C. was fully integrated into her maternal relative's home. Her younger brother, O.G., also lived in this relative placement. The family informed DCFS of their intent to formally adopt H.C. and her brother, O.G. Here, the record clearly reflects that termination of Jakob's parental rights was the appropriate outcome for H.C. She deserves the permanence and stability that termination would provide. We conclude that the trial court's decision to terminate Jakob's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 38                                  III. CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgments of the circuit court of Vermilion County.


¶ 40    Affirmed.

16