NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230188-U

NOS. 4-23-0188, 4-23-0196 cons.

IN THE APPELLATE COURT

FILED
July 19, 2023
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* S.J. and B.J., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 19JA237 |
| v. | ) | 19JA238 |
| Fredderick W., | ) | |
| Respondent-Appellant.) | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed, holding (1) the trial court's finding that respondent
was unfit on the basis that he failed to maintain a reasonable degree of interest,
concern, or responsibility for the minors' welfare was not against the manifest
weight of the evidence and (2) the court's finding that termination of respondent's
parental rights was in the minors' best interests was not against the manifest
weight of the evidence.

¶ 2   Respondent, Fredderick W., appeals the trial court's order terminating his parental

rights as to his children, S.J. (born in 2015) and B.J. (born in 2010). Specifically, respondent

argues: (1) the court's finding that he was unfit was against the manifest weight of the evidence

and (2) the court's finding that termination of his parental rights was in the best interests of the

minors was against the manifest weight of the evidence. We affirm.

¶ 3                           I. BACKGROUND

¶ 4        On December 3, 2019, the State filed petitions alleging S.J. and B.J. were neglected pursuant to section 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)) in that they were not receiving the proper care and supervision necessary for their well-being in that their mother, Pearlitha J., failed to make a proper care plan for them. The petitions also alleged S.J. and B.J. were abused under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)) in that they were at substantial risk of physical injury as evidenced by Pearlitha's abuse of and use of excessive corporal punishment on their sibling. On March 12, 2020, the minors were adjudicated neglected. On June 24, 2020, dispositional orders were entered finding the minors' parents unfit, unable, or unwilling to care for them, making them wards of the court, and granting custody and guardianship of them to the Illinois Department of Children and Family Services (DCFS).

¶ 5        On December 1, 2021, the State filed a motion to terminate respondent's parental rights as to S.J. The motion alleged respondent was unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) in that he had (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to S.J.'s welfare (*id.* § 1(D)(b)); (2) abandoned S.J. (*id.* § 1(D)(a)); and (3) deserted S.J. for more than three months prior to the filing of the motion (*id.* § 1(D)(c)). Respondent was served via abode service on February 7, 2022, and he entered his appearance in the case on March 3, 2022. The trial court entered orders on July 6, 2022, stating DNA testing had shown respondent was the biological father of S.J. and B.J.

¶ 6        On July 11, 2022, the State filed a supplemental motion for termination of respondent's parental rights as to S.J. and an initial motion for termination of parental rights as to B.J. The motions alleged respondent was unfit within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) in that he failed to make reasonable efforts to

correct the conditions that were the basis for the removal of the minors (*id.* § 1(D)(m)(i)) and failed to make reasonable progress toward the return of the minors (*id.* § 1(D)(m)(ii)) during three specified nine-month periods after the neglect adjudication. The motion to terminate respondent's parental rights as to B.J. also alleged respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to B.J.'s welfare (*id.* § 1(D)(b)); (2) abandoned B.J. (*id.* § 1(D)(a)); and (3) deserted B.J. for more than three months prior to the filing of the motion (*id.* § 1(D)(c)).

¶ 7          At the unfitness hearing on January 5, 2023, the trial court took judicial notice of the court files in Sangamon County case Nos. 19-JA-237 and 19-JA-238. Elizabeth Lerch testified that she was previously employed by DCFS and was assigned to the minors' case from December 2019 until March 2020 and again from July 2020 until May 2021. Lerch was notified respondent was the putative father of B.J. and S.J. She saw him at a visit, which she believed occurred in February 2020. She advised respondent he would not be able to attend future visits until his paternity was established. She discussed with him the importance of establishing his paternity and how he could do so. He attended another visit in early March 2020 as well. Lerch let him stay but reiterated he was not allowed to be at the visits because his paternity had not been established. Later that month, another caseworker was assigned to the case while Lerch was on maternity leave.

¶ 8          Lerch testified she was reassigned to the case on July 1, 2020. At that time, respondent still had not established his paternity. Lerch "reach[ed] out" to respondent and told him DCFS could make a referral for him to complete DNA testing. She told him they needed to establish his paternity so he could visit the minors and complete services to regain custody of them. Respondent told Lerch he was unsure if he wanted to complete paternity testing because

- 3 -

"he thought it would change things within his life or within his family." She left the option of paternity testing open to him if he decided he wanted to do it. At one point, respondent told Lerch that he did not want to be involved with DCFS and that Pearlitha would do what she needed to do to regain custody of the minors. Lerch stopped communicating with respondent after that conversation, but the contact information for DCFS remained the same. Respondent had not completed paternity testing as of May 2021.

¶ 9 Jenny Metzroth testified that she was the caseworker assigned to the minors' case from March 2020 through June 2020. During that time, she asked respondent to cooperate with paternity testing, which was the only service being requested of him. A paternity test was scheduled for early April 2020, but it was rescheduled for late May or June 2020 due to the COVID-19 pandemic. Metzroth informed respondent of the initial scheduled test by text message and of the rescheduled test by sending a letter to the address she had on file for him.

¶ 10 Metzroth was reassigned to the case from May 2021 until May 2022. She attempted to contact respondent at that time by completing four diligent searches, which all yielded the same address. She sent letters to that address, but respondent never replied to the letters. Metzroth stated that, although she initially communicated with respondent via phone calls and text messages, she lost his phone number when her cell phone broke.

¶ 11 Metzroth testified that she saw respondent in court in March 2022, when the termination hearing had originally been scheduled. He informed Metzroth that he had not received her letters because he did not reside at the address where she had sent them. He indicated the mother of some of his other children resided there, and he received the summons for the termination hearing because he happened to be at her house when it arrived. Metzroth testified the contact information for DCFS did not change while she was the caseworker, and

- 4 -

respondent knew how to contact DCFS. In April 2022, respondent indicated he was willing to cooperate with paternity testing. He told Metzroth he decided to "step up" when he figured out Pearlitha was not "going to do what she needed to."

¶ 12　　　　Rachel Bridges testified that she became the caseworker for the minors' case in May 2022. She indicated respondent completed DNA testing on May 31, 2022, and the results came back showing he was the father of S.J. and B.J. on June 16, 2022. An integrated assessment was conducted in September 2022, and it was recommended that respondent complete domestic violence perpetrator services and substance abuse services. DCFS wanted to see respondent begin to make progress in these services before starting visitation with the minors. Bridges went on maternity leave in November 2022. At that time, respondent had not engaged in services and had not had any visits with S.J. and B.J. Bridges stated she believed respondent had not seen S.J. or B.J. for a year and a half to two years prior to her taking over the case.

¶ 13　　　　The trial court found the State had shown by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to S.J. and B.J.'s welfare due to his long delay in becoming involved in the case despite having been told of the importance of completing paternity testing. The court also found the State had shown respondent failed to make reasonable efforts to correct the conditions that brought the children into care or reasonable progress toward the return of the children during all of the nine-month periods alleged in the termination motion. The court did not find respondent to be unfit on the bases of abandonment or desertion.

¶ 14　　　　The trial court held a best interests hearing on March 2, 2023. Pursuant to the State's request, the court took judicial notice of the court file and the testimony provided during the unfitness hearing. Metzroth testified that that, between March 2020 and June 2020, B.J. was

placed in several different fictive kin foster placements due to behavioral disruptions. When the case was reassigned to Metzroth in May 2021, B.J. was in a residential facility. Metzroth arranged for B.J. to live with her aunt after leaving the facility, but she was no longer the caseworker when B.J. left the facility. Metzroth testified S.J. had been with the same fictive kin placement since December 2019, and she had been able to view S.J. in that placement. S.J.'s foster parent provided for all her needs, including her medical, educational, social, and religious needs. S.J.'s two younger sisters resided there as well. S.J. appeared to be very attached to her foster parent.

¶ 15   Metzroth stated that, when she ceased being the caseworker in May 2022, she believed termination of respondent's parental rights was in the minors' best interests. They had been in foster care for two and a half years at that time, and respondent had just come forward and expressed an interest in engaging in services. Metzroth did not think it was fair to the minors to allow them to stay in foster care and wait for a parent who might or might not complete services. Metzroth indicated she could not "speak to" whether a bond existed between respondent and the minors because she never had an opportunity to observe them together. She stated: "Neither [minor] ever spoke to me about him because the entire time I was the caseworker, he was not visiting or a part of their lives."

¶ 16   Bridges testified that, once respondent's paternity was established, he began having visitation in late November or early December 2022. Respondent had approximately four to five visits with S.J. and B.J. The records Bridges had reviewed indicated the visits went well. Bridges testified that, after "going through the history of the case and reading through everything," she believed respondent had "in-and-out involvement" in the minors' lives before DCFS became involved.

¶ 17　　　　　Bridges testified that S.J. had been residing in the same foster placement since December 2019, and it had become her home. She was involved in sports, enjoyed school, and was "thriving." Bridges stated B.J. was doing "really well" at her placement with her aunt. B.J. was happy, was enjoying school, and was not exhibiting any of the behavioral problems she had in the past. Bridges indicated B.J. was the most stable she had been since the beginning of the case. Both S.J.'s and B.J.'s foster parents had indicated they were willing to provide permanency for the minors through adoption. Bridges testified that B.J. knew respondent was her father, but she did not speak about him much. Bridges was not aware of a bond or attachment between S.J. and respondent. Bridges indicated that both minors wished to stay in their current placements, and she opined that termination of respondent's parental rights was in their best interests.

¶ 18　　　　　Respondent testified he had three visits with S.J. and B.J. in the preceding six months, and the visits went well. S.J. and B.J. indicated they missed respondent and wanted to live with him. When asked about his involvement with S.J. and B.J. before DCFS became involved, respondent indicated he was always "there." However, he would "coparent from a distance" when he and Pearlitha were not together. He was not permitted to attend supervised visits with Pearlitha earlier in the case, but he was sometimes able to speak to the minors via FaceTime when he was around Pearlitha. Respondent indicated that currently he resided with his three other children and his "significant other." S.J. and B.J. had met their three half-siblings approximately four times before the juvenile case commenced. Respondent indicated he had suitable housing for S.J. and B.J. and adequate income to support them.

¶ 19　　　　　Respondent testified that he did not complete paternity testing right away because Lerch told him Pearlitha was successfully completing services and that everything would "basically start over" if he became involved. He did not learn Pearlitha was not successfully

completing services until he received the summons about the termination proceedings. Respondent acknowledged he was told he would have to complete paternity testing before he "could even be considered as a matter in this case." However, he did not complete paternity testing because he "felt like DNA being a means to see the children and be a part of their lives was irrelevant at that moment."

¶ 20 The trial court stated it had considered all the statutory the best interests factors. The court noted that S.J. came into care when she was four years old, had been in the same home for over three years, and was thriving there. The court stated B.J. had been in the same home since June 2022, and it was the longest she had been in a stable home since she came into care. The court stated it was "outraged" that respondent thought it was "irrelevant that all that was asked of him was to do a DNA test." The court noted that, because respondent refused to do a DNA test, he went over a year without seeing his children. The court found termination of respondent's parental rights was in the best interests of the minors. This appeal followed.

¶ 21       II. ANALYSIS

¶ 22 On appeal, respondent argues: (1) the trial court's finding that he was unfit was against the manifest weight of the evidence and (2) the court's finding that termination of his parental rights was in the best interests of S.J. and B.J. was against the manifest weight of the evidence.

¶ 23       A. Unfitness

¶ 24 Respondent argues the trial court erred by finding he was unfit in that he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as the minors' welfare; (2) failed to make reasonable progress toward the return of the minors during the nine-month periods set forth in the termination motions; and (3) failed to make reasonable efforts to correct

the conditions that were the basis for the removal of the minors during the nine-month periods set forth in the termination motions. Respondent contends that each of these findings of unfitness was against the manifest weight of the evidence.

¶ 25 A court's statutory authority to involuntarily terminate parental rights is delineated by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re M.I.*, 2016 IL 120232, ¶ 19. Pursuant to section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the court must first find by clear and convincing evidence that the individual is unfit as defined in section 1 of the Adoption Act (750 ILCS 50/1 (West 2022)). If the court makes a finding of parental unfitness, the court then considers whether termination of parental rights is in the best interests of the minor. 705 ILCS 405/2-29(2) (West 2022)). See also *M.I.*, 2016 IL 120232, ¶ 20.

¶ 26 Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) sets forth several grounds for unfitness, each of which provides a discrete basis for a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). While the State may rely on several grounds in its termination motion, "a finding adverse to the parent on any *one* ground is sufficient to support a subsequent termination of parental rights." (Emphasis in original.) *Id.*

¶ 27 Pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)), one ground for parental unfitness is "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." This includes "all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *M.I.*, 2016 IL 120232, ¶ 26. The language in section 1(D)(b) is disjunctive such that "any of its three elements—the failure to maintain a reasonable degree of interest *or*

concern *or* responsibility as to the child's welfare—may be considered on its own as a basis in determining whether the parent is unfit." (Emphases in original.) *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24.

¶ 28 In determining whether a parent is unfit under section 1(D)(b), the parent's conduct must be considered in the context of circumstances in which it occurred. *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). A court must "examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *Id.* at 279. However, "a parent is not fit merely because [he or] she has demonstrated some interest or affection toward [his or] her child; rather, [his or] her interest, concern and responsibility must be reasonable." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Noncompliance with an imposed service plan and infrequent or irregular visitation have been held to warrant a finding of unfitness under section 1(D)(b). *Id.*

¶ 29 A trial court's finding of unfitness will not be reversed on review unless it is against the manifest weight of the evidence. *M.I.*, 2016 IL 120232, ¶ 21. "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 30 Here, the trial court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors was not against the manifest weight of the evidence. Respondent's decision to wait over two years to establish his paternity so that he could visit his children and participate in services constituted a failure to maintain a reasonable degree of responsibility for their welfare. The evidence at the unfitness hearing showed respondent was informed early in the case that he needed to complete paternity testing before he could attend visits with the minors or participate in services to work toward

- 10 -

reunification with them. However, respondent indicated that he did not want to be involved with DCFS and that Pearlitha would do what she needed to do to regain custody of the minors. He expressed no interest in being involved in the case until March 2022, after receiving a summons regarding the termination proceedings. He indicated he decided to "step up" at that time because he determined Pearlitha was not going to do what she needed to do. However, at that point, the children had been in foster care for over two years, and, according to Bridges's testimony, respondent had not seen them for approximately a year and a half to two years.

¶ 31 We reject respondent's argument that his failure to complete paternity testing was because the test originally scheduled for April 2020 was rescheduled and he was not advised of the new date. While Metzroth testified she informed respondent by letter that the test had been rescheduled for late May or June 2020 and was later told respondent did not receive letters sent to that address, the record shows respondent's failure to complete paternity testing in 2020 was not because he did not receive this letter. Lerch testified that she spoke to respondent after the case was reassigned to her in July 2020 (after respondent had missed the rescheduled test). At that time, she offered to make a referral for him to complete paternity testing, and he indicated he was unsure whether he wanted to do it. He also told Lerch that he did not want to be involved with DCFS. Moreover, Metzroth and Lerch testified that respondent had the contact information for DCFS, which did not change during the case. However, respondent did not contact DCFS to complete paternity testing until over two years after the case commenced.

¶ 32 Because we have found the trial court did not err in finding respondent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare, we need not consider whether he was also unfit based on his failure to make reasonable

efforts or reasonable progress during the nine-month periods alleged in the termination motions. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 33                                B. Best Interests

¶ 34        Respondent also argues the trial court's finding that termination of his parental rights was in the minors' best interests was against the manifest weight of the evidence. Respondent contends he was fully capable of providing for the minors' needs, had suitable housing and sufficient income to care for the children, was involved in their lives before the commencement of the juvenile case, and had been having visits with the children that went well.

¶ 35        After a trial court has made a finding that a parent is unfit, the court must then consider whether termination of parental rights is in the best interest of the minor. 705 ILCS 405/2-29(2) (West 2022)). See *M.I.*, 2016 IL 120232, ¶ 20. In making a best interests determination, the court must consider the following statutory factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

See 705 ILCS 405/1-3(4.05) (West 2022).

¶ 36        After a finding of unfitness, the focus shifts from the parent to the child. *In re*
*D.T.*, 212 Ill. 2d 347, 364 (2004). "Accordingly, at a best-interests hearing, the parent's interest
in maintaining the parent-child relationship must yield to the child's interest in a stable, loving
home life." *Id.* The State must prove by a preponderance of the evidence that termination of
parental rights in in the best interest of the minor. *Id.* at 366. We will not reverse a trial court's
finding that termination is in the best interest of the minor unless it is against the manifest weight
of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 37        Here, the trial court's finding that the State proved by a preponderance of the
evidence that termination of respondent's parental rights was in the best interests of the minors
was not against the manifest weight of the evidence. The record indicates the court considered
the requisite statutory factors in making its determination. The evidence at the best interests
hearing showed that S.J. had been in her foster placement for over three years, was well taken
care of there, and viewed her placement as her home. She was residing with two of her siblings,
and her foster parent was willing to adopt her. The evidence showed B.J. was happy and stable in
her placement with her aunt, which she had been in for approximately nine months at the time of
the best interests hearing. Due to behavioral issues earlier in the case, she had to switch
placements several times and was placed in a residential facility. Bridges testified B.J. was
thriving in her placement with her aunt, who was willing to adopt her. This evidence showed S.J.
and B.J. had strong attachments at their current placements, their current placements provided for
their needs, and their current placements could provide permanence.

¶ 38        While respondent had recently become involved in the case, had begun
participating in services, and had a few visits with the children that had gone well, he previously
had not seen them for over a year due to his failure to complete paternity testing until May 2022.

Accordingly, his ability to provide permanency for the minors was speculative. Respondent indicated the children told him they wanted to live with him and that he had always been involved in their lives before the juvenile case commenced. However, Bridges testified that the children had expressed that they wished to stay in their current placements. She also testified that the information she reviewed indicated respondent had "in-and-out involvement" in the minors' lives before the commencement of the juvenile case. Considering all the evidence at the best interests hearing and the relevant statutory factors, we conclude the trial court's finding that termination of respondent's parental rights was in the minors' best interests was not against the manifest weight of the evidence.

¶ 39                                    III. CONCLUSION

¶ 40           For the reasons stated, we affirm the trial court's judgment.

¶ 41           Affirmed.