NOTICE

Decision filed 11/16/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 230452-U

NO. 5-23-0452

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF JAXON R. | ) | Appeal from the |
| | ) | Circuit Court of |
| (Sabrina J. Moss, | ) | Macon County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | No. 21-AD-61 |
| v. | ) | |
| | ) | |
| Charles R., natural parent, | ) | Honorable |
| | ) | Phoebe S. Bowers, |
|     Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The court's unfitness and best interest findings were not manifest error; however, we modify the judgment to reflect the court's oral judgment that father was unfit only for failure to maintain a reasonable degree of responsibility.

¶ 2    Charles R., father of Jaxon R., appeals from the circuit court's May 31, 2023, order finding Charles unfit and June 22, 2023, order finding it was in Jaxon's best interest to terminate Charles's parental rights. For the following reasons, we affirm as modified.

¶ 3                           I. BACKGROUND

¶ 4    On September 17, 2021, Sabrina Moss filed a petition to adopt her great-grandson, Jaxon R., born November 8, 2013. The petition noted Moss was appointed guardian of Jaxon on March 6, 2015, in Macon County case No. 15-P-61. It further alleged Jaxon's father, Charles R., was in

the custody of the Illinois Department of Corrections, and was unfit for abandoning Jaxon, failing to maintain a reasonable degree of interest, concern, or responsibility as to Jaxon's welfare, and deserting Jaxon for more than three months preceding the commencement of the proceedings. Moss contended Jaxon's mother, Charity C., was unfit for the same bases as Charles.[1] Moss asserted that she was a reputable person with the character, ability, and means to nurture and educate Jaxon in a suitable and proper manner. She requested the court appoint a guardian *ad litem*, terminate the parental rights of Charles and Charity, grant the petition, and add the last name "Moss" to the end of Jaxon's full name.

¶ 5     On June 6, 2022, Charles filed a *pro se* motion to dismiss and a supporting memorandum, arguing he was not unfit. He contended a criminal conviction is neither necessary nor sufficient to establish depravity and argued there were no other facts to establish that Charles was unwilling or unable to conform to accepted moral standards.

¶ 6     With respect to a reasonable degree of interest, concern, and responsibility for Jaxon's welfare, Charles asserted he kept in consistent contact, even while incarcerated, with the Department of Children and Family Services (DCFS) after Jaxon was removed. Charles complained that DCFS did not inform him of the services he needed to complete that would enable him to work towards visitation. He spoke with his son on the telephone and sent mail to Jaxon. He also alleged that he sent cards and presents for Christmas and Jaxon's birthday. Charles noted it was his effort to carry out his responsibilities, rather than his success, that was determinative and the fact that the custodial parent hindered visitation of a noncustodial parent was a significant element and weighed against finding unfitness.

---

[1]Charity's parental rights were also terminated as a result of this petition. However, she is not a party to this appeal. As such, we discuss Charity only to the extent necessary to resolve this appeal.

¶ 7    Charles further argued that he did not abandon Jaxon as he stayed in constant contact, and Moss prevented further visitation. Charles contended the calls could be verified through the Department of Corrections or by subpoenaing the records from Securus Technologies. He stated that he catered and nourished Jaxon's mental and emotional welfare as well as his financial welfare when possible. According to Charles, absent his incarceration, the "record contained almost no basis to conclude that [he] was an unfit parent."

¶ 8    The court denied Charles's *pro se* motion to dismiss and later denied his motion to reconsider. On February 9, 2023, Ben Mullison was appointed to represent Charles. On March 23, 2023, Moss filed an amended petition for adoption, with the same allegations as seen in the initial petition.

¶ 9    A fitness hearing was held on May 31, 2023. Moss testified that she had lived in Macon County her entire life, was Jaxon's great-grandmother, and Jaxon was not quite 10 years old. Charles was her grandson. Moss averred that Jaxon's mother left Jaxon with Moss when he was three months old because she was afraid Charles would come to her home if she kept Jaxon.

¶ 10    Moss stated that Charles was incarcerated before Jaxon was born and remained incarcerated. When she spoke with Charles about the birth of Jaxon, Charles did not express any interest or inquire about Jaxon's health or well-being. She testified that Charles never provided financial support.

¶ 11    Moss averred that Charles could call from the Department of Corrections, and she used to provide the means for Charles to use the telephone at the prison. She believed his current sentence was 30 years to be served at 85%. She tried to let Charles talk to Jaxon when Jaxon was about three or four years old. Jaxon could barely talk, and Charles would talk "about some boogers or whatever, not no conversation that [she] would like to hear." Moss stated, "So that ended *** he

3

didn't call often." She clarified that, sometimes, it would be two or three months between calls, but Charles never inquired about Jaxon's well-being. When Charles called, the phone would be on speaker such that Moss could overhear Jaxon and Charles's conversations.

¶ 12    Since Jaxon started school, Charles called—at least—sometimes, but Moss had to instruct Charles to ask Jaxon about school. She believed it was in Jaxon's best interest to terminate Charles's parental rights and grant the petition for adoption.

¶ 13    On cross-examination, Moss stated that Charles never offered to provide financial support. When asked how often Charles called to speak to Jaxon, Moss stated not often, and Charles's reason when he did not call was that he would be in trouble or lockdown. Sometimes, she would not hear from him for a couple of months, but there was never a complete year that went by without a call from Charles. Moss agreed that Charles typically called once every two or three months.

¶ 14    Moss stated that Jaxon would sometimes want to talk to Charles but sometimes did not because Charles would say "silly stuff." Moss averred that since Jaxon started school, Charles made arrangements for Jaxon to receive Christmas presents from the Angel Tree program, which sent presents out to prisoners' children, and made similar arrangements for Jaxon to receive birthday presents. Charles also wrote Jaxon letters "not often, but sometimes." Moss stated that Jaxon never wrote back or asked Moss to write back on his behalf. She took Jaxon to see Charles once but Jaxon did not want to go back.

¶ 15    Charles's counsel asked Moss if Charles had Ashanti Jordan purchase a phone for Jaxon so that it would be easier to maintain contact with Charles. Moss stated the phone had nothing to do with Charles. It was a present given to Jaxon, and she had to pay for the phone service because no one else offered.

¶ 16    The guardian *ad litem* asked Moss whether Charles's current conviction was his sole mistake as an adult. Moss stated that before the conviction, Charles stayed in and out of problems, and Charles wanted to be a gangster. Moss tried to prevent it. She also stated that Charles was shot before his conviction. Upon inquiry from the guardian *ad litem*, Moss also stated there was a lot of domestic violence between Charles and Charity because she saw Charity's bruised eyes a lot.

¶ 17    On redirect, Moss stated that Jaxon currently had an iPhone, but Charles had her home number to call. The court asked Moss if she would guess that Charles calls five or six times a year. Moss stated, "He might call a little more than that ***." She stated that sometimes Jaxon did not want to talk to Charles because "he talks silly." Moss testified she had to guide Charles to talk about "school, something sensible ***, instead of something stupid."

¶ 18    When the court asked if Charles sent Jaxon birthday presents every year, Moss explained that Charles's girlfriend began bringing presents over two or three years ago, but Moss stopped that after the girlfriend failed to show up after Moss told Jaxon she was coming over without further explanation. Moss also testified that the girlfriend said in front of Jaxon that "I'm not his mom anyway. I'm not his real mom. I can just do this when I want to. I don't have to do this."

¶ 19    Moss's counsel called Charles as an adverse witness. Charles stated that he knew Charity was pregnant prior to his incarceration. Charles was unaware of the Illinois Putative Father Registry, or that he was supposed to register that he was the father of Jaxon. As such, he did not register.

¶ 20    Charles agreed that he was serving a 30-year prison term at 85%, and that other charges were dismissed as part of that plea agreement. Charles then explained the nature of his conviction, stating he and Cameo McCrory entered into a house with masks on and McCrory was armed with a gun. He stated that McCrory directed the four people in the house to perform sexual acts on each

5

other. Charles and McCrory then took those people to another house, in which he and McCrory committed home invasion, and then left all four people in the country with no clothes on.

¶ 21 Charles rejected any notion that he failed to contact Jaxon until Jaxon was three or four years old. He explained that Jaxon could not really talk before then so there was no conversation to be had, but he would ask Moss about Jaxon. Once Jaxon got older, the conversations matured and they would discuss his favorite subject in school, working out, healthy diets, and Jaxon's tournaments. Charles also stated that Jaxon brought up the topic of girlfriends when Charles got engaged to a woman other than Jaxon's mother. He stated he would also talk about Jaxon's temperament when Jaxon got in trouble at Moss's house. Charles averred that he helped Moss discipline Jaxon by telling Jaxon to do push-ups or other things when Jaxon did not complete his chores. He also encouraged Jaxon to help Moss out around the house.

¶ 22 Charles agreed that he had not provided any kind of financial support but had "actually fought to be on child [support]." Counsel asked why Charles never followed up on the petition he filed in family court in 2015 that was later dismissed for want of prosecution. Charles stated he did not know how to follow up with it. He further explained that he resubmitted the petition in 2018 when he figured out nothing proceeded on the 2015 petition. Counsel inquired about the appeal of that case, and Charles explained that "they sent me a letter back saying that when I get out, I should make a court date or something like that, *** [s]o I appealed it."

¶ 23 On cross-examination, Charles further explained that he appealed the court's failure to grant him visitation. He agreed that he had been trying to the best of his ability to know what was going on in Jaxon's life since he was born. Charles stated that he had been trying to talk to Jaxon since Jaxon was able to talk. He also attended prenatal appointments with Charity prior to Jaxon's birth.

6

¶ 24 The guardian *ad litem* inquired about Charles's current conviction and asked whether Charles was present when somebody used an impromptu blowtorch on one person's genitals. Charles answered affirmatively. Charles admitted he did not try to leave during the commission of those crimes but averred that he tried to stop it.

¶ 25 Upon further questioning, Charles admitted that he was moved from the first correctional facility because he used his brother's pin number when his own phone time ran out. He was moved a second time when he was caught on camera trying to hide a weapon.

¶ 26 The court asked Charles to clarify his statement that while imprisoned he does not "get into any trouble, like trouble." Charles explained that he did not get into trouble for violence. He then admitted that, in addition to the previously mentioned citations, he threatened to harm a correctional officer. The court inquired about the weapon that he hid. Charles stated that it was similar to a knife, but he did not make it; he just grabbed it out of the shower and put it under a washcloth. Charles averred he did not have any ill intent.

¶ 27 When the court asked how often he believed he spoke with Jaxon, Charles stated he called all the time, but Moss was busy taking Jaxon to things. He even made a system to talk with Jaxon where his fiancée would go to Moss's home and call Charles if Moss did not pick up. The court inquired how Charles would be responsible for Jaxon while imprisoned. Charles admitted he could do nothing physically but could be there for Jaxon emotionally and mentally. He stated his son was everything to him.

¶ 28 Charles testified that Moss once wrote a letter to Charles, telling him that she could "take everything away." He then stated there were always good intentions and that he always thanked Moss when she put money in his account so he could call. But, after she sent that letter, he put his

7

own money in his account to call. Charles stated that he loved Moss, but never felt like he was a part of a family, so his son was everything to him.

¶ 29  Moss's counsel then marked a copy of the results of the search of the Illinois Putative Father Registry as Plaintiff's Exhibit No. 1. With no objection, the court admitted the exhibit and took judicial notice of Macon County case No. 13-CF-646. Moss then rested on the issue of fitness.

¶ 30  Charles's counsel called Charles's fiancée, Ashanti Jordan, to testify. Jordan stated she helped Charles maintain contact with Jaxon. She would go to Moss's house "constantly, almost every day for a couple of years," then stopped around the end of 2019 because she felt uncomfortable there. During her visits, Charles would call to talk with Jaxon. After she stopped going, Charles informed Jordan of his conversations with Jaxon when he made contact. Jordan stated that Charles knew everything about Jaxon, including his favorite color, girlfriends, and grades in school. Jordan testified that Charles sent gifts to Jaxon through the Angel Tree program and bought Jaxon a phone for Christmas one year. Jordan averred that Jaxon asked about Charles all the time.

¶ 31  On cross-examination, Jordan clarified she was around Jaxon for about a year and bought Jaxon's presents with her own money. The guardian *ad litem* asked how often Charles called her, and she answered, "every other day, when they would have time out." On redirect, Jordan explained that Charles called her only if he could not contact Jaxon and would always try to call him first.

¶ 32  Charles's counsel next called Charles's father, Michael Dandy. Dandy testified that Charles made multiple calls and wrote letters to Jaxon. Charles also asked Dandy to go by Moss's home, and he did go a couple times but was not comfortable. Dandy stated that Charles contacted him

about three or four times a week and talked about his son basically every time. Dandy had not been around Jaxon since he was 10 months old.

¶ 33    On cross-examination, Dandy agreed that his knowledge of Charles contacting Jaxon was based only on Charles telling him such. Upon questioning from the guardian *ad litem*, Dandy stated that he had been convicted of identity theft in case No. 2019-CF-544. When counsel asked if he was unsuccessfully terminated from probation in case Nos. 2018-CF-228, 2016-CF-1643, and 2015-CF-30, Dandy exercised his fifth amendment rights.

¶ 34    Counsel then recalled Charles to testify. Charles stated that his ability to financially provide for his son was incredibly limited by being imprisoned. Instead, he enlisted the help of family and friends to ensure Jaxon received presents and was taken care of otherwise.

¶ 35    Charles testified that he told Moss to put him on child support around 2018. Charles averred that he also attempted to maintain a relationship between Jaxon and other family members, *i.e.*, Charles's sister and her children. When asked about the frequency of his calls to Jaxon, Charles stated the records do not lie and if they were to subpoena the records, they would show that he called. He stated, "Maybe I didn't connect, but I called." Charles clarified that anytime he could call Jaxon, he did. He asked Moss to put her cell phone number on his call list because he knew they travelled, but she refused because she was "doing business." He testified the only time he went two or three months without talking to Jaxon was recently, and that was because the phone was never answered. Charles also tried to enlist the help of his sister, mother, and cousin, but they would not go to Moss's home because they were uncomfortable.

¶ 36    With respect to his conviction, Charles stated that he tried to stop McCrory by telling him "let's go," but McCrory was the only person with a gun. Charles stated Jaxon asked about his imprisonment and he provided Jaxon with additional information about his conviction the older

9

Jaxon became. Upon a final questioning from the guardian *ad litem*, Charles stated he knew he had a child on the way before he committed offenses with McCrory. Charles further stated that he had many pictures of Jaxon.

¶ 37 The court asked Charles the location of the phone records. Charles stated he did not know how to subpoena the phone records but asked his attorney to subpoena them. The court also inquired about the appeal of the 2018 petition for visitation, and Charles stated that "they sent it back" due to the failure to pay fees. After the parties provided closing arguments, the guardian *ad litem* argued it was impossible for Charles to demonstrate an ability to be responsible for Jaxon due to his own actions and constraints of his own making.

¶ 38 The court found Moss failed to prove Charles abandoned Jaxon, was depraved, or failed to maintain interest or concern. However, the court found Moss sufficiently proved Charles failed to maintain a reasonable degree of responsibility as to Jaxon's welfare. The court found Moss's testimony more credible regarding the number of phone calls Charles made. It further noted that Charles had not sent any money or done anything to be responsible for Jaxon. The court stated, "I get that he's in prison, but that was for a decision that he made, and so he created the limitation of responsibility." The court also reasoned that Charles was not around to make any decisions regarding the child's medical care, education, or religion and Charles would not be out of prison until Jaxon was over the age of 18.

¶ 39 The best interest hearing was held on June 22, 2023. Moss testified that she was appointed guardian of Jaxon in Macon County case No. 15-P-61. Moss averred she was 68 years old and had no legal disabilities. She was employed as a full-time realtor, managing apartments from Lyle, Campbell & Sons. Her employment allowed her to be home when Jaxon got home from school, and during the summer months, Jaxon would go with her to work.

10

¶ 40    Moss stated Jaxon had asthma and was up to date on his medical appointments and shots. He was an A student and going into the fourth grade. Moss testified that she previously adopted her great-granddaughter, who lived with her and Jaxon. Moss had her home for 20 years, and everyone had their own bedrooms.

¶ 41    Moss stated that Jaxon participated in football, church, wrestling, and jujitsu. He also qualified for the Youth Olympics Games in Taekwondo. Moss understood that granting the adoption would make her Jaxon's mother for all intents and purposes, and she would be solely responsible for him. She explained that she had the financial means to raise Jaxon and had been doing so all these years. Upon questioning from her counsel, Moss stated she had never been convicted of a felony and did not have a history of abusing children.

¶ 42    On cross-examination, Moss testified that whether or not the petition to adopt was granted, she would still be the person taking care of Jaxon. Charles's counsel asked, "in what way would terminating rights of these parents do something useful for Jaxon." Moss explained that Jaxon could draw from her retirement and benefits and have a place to stay if she passed away earlier than expected. Counsel asked if Moss could do those things without terminating parental rights. Moss agreed she might be able to do so, but it was also possible she could not. She explained that relatives and friends had similar difficulties when children had different last names. She would be more at ease knowing Jaxon would inherit her benefits if the adoption was granted.

¶ 43    Moss testified that since the fitness hearing, Charles spoke to Jaxon once or twice. She was unaware of how many times Charles attempted to contact Jaxon because Jaxon was getting ready for the Olympics and had been on the go. She had to make Jaxon speak to Charles because Jaxon otherwise refused.

¶ 44   Charles's counsel called Charles's sister, Sabrina Eskridge, to testify. She was employed at the Macon County Sheriff's Office. Eskridge lived with Moss from about 2 years old to 17 years old. She testified that Moss was inadequate to care for Jaxon because she was abusive. Eskridge stated Moss abused her as a child. Specifically, she stated Moss broke a glass over her head, beat her with a tree branch wrapped with electrical tape, and threw hot water on her and her siblings. Eskridge had children of her own and they were not allowed to be around Moss.

¶ 45   Eskridge had not been around Jaxon while he was in Moss's care. Eskridge attempted to go see him but quit trying when she never received a call back. When asked "you couldn't say one way or the other whether or not Jaxon is receiving the same abuse that you did," Eskridge replied "As of right now, no." However, she clarified that she knew Moss abused Jaxon at one point but not to the extent she was abused.

¶ 46   Eskridge acknowledged that she had little opportunity to personally see the interaction between Jaxon and Charles, but said Charles asked about him a lot and often requested pictures of Jaxon. She stated that Jaxon loved Charles. When asked if there was anything else the court should know, Eskridge stated, "I just feel that even if it doesn't go in [Charles's] favor that [it] shouldn't be in [Moss's] favor either."

¶ 47   On cross-examination, Eskridge stated that incidents of abuse began around the time she was in sixth grade until she was 17 years old. She did not report the abuse to the police or DCFS, but stated, "people knew about it." She also clarified that she was not present for any interactions between Charles and Jaxon.

¶ 48   Charles's mother, Dorthea Morrison, testified that she was employed at Heritage Behavioral Health as a substance abuse counselor and nonviolent crisis intervention instructor.

12

She was partially raised by Moss and suffered physical, verbal, and mental abuse at the hands of Moss. She also observed Moss being abusive to her children, including Charles and Eskridge.

¶ 49 On cross-examination, Morrison testified that Moss raised all three of her children when Morrison went to treatment for alcoholism. When Morrison discovered Moss sought guardianship of her children, Morrison unsuccessfully contested the guardianship. Morrison testified that she reported Moss's abuse of her children to DCFS but admitted the children continued to reside with Moss thereafter. The court asked Morrison if she ever took back guardianship of her children, and Morrison stated that her youngest child ran away from Moss's home to stay with Morrison when the child was about 17 years old.

¶ 50 Charles testified that when he spoke to his son, Jaxon told Charles that he loved him. Charles believed Jaxon looked forward to speaking to him. Charles averred that Moss raised him and abused him physically, verbally, and emotionally. He also observed Moss abuse his sister. The abuse stopped when he was 16 years old and went to juvenile detention. When asked if he had any other pertinent information, Charles stated, "I don't want him to go through what I went through. Like I'm trying to alleviate a lot of things, anguish that I went through and I still deal with to this day ***."

¶ 51 Upon questioning from the court, Charles agreed that he had never taken care of Jaxon. He further stated that if it was up to him, Jaxon would stay with Charles's little sister. According to Charles, being with his sister would allow Jaxon to see Charles and have family without family being shunned. In his sister's house, Jaxon would be "surrounded by love and family instead of ridicule of, oh, you gonna be just like your dad." The court asked Charles if he knew whether Moss actually said those things to Jaxon. Charles discussed two incidents, one where Jaxon pulled away

13

from Moss after she grabbed him and another when Jaxon argued with his cousin. Charles stated he did not want Jaxon to grow up thinking he is not good enough like Charles did.

¶ 52    After the parties made closing arguments, the court stated that it found the allegations of abuse unbelievable when no one "had any problem with Ms. Moss taking care of Jaxon for the last nine years." As such, it did not find Eskridge, Morrison, or Charles credible. It further noted that there was no proof of any reports of child abuse. The court stated that Charles was in no position to take care of Jaxon when he was incarcerated for a significant act of violence.

¶ 53    Addressing the statutory factors, the court stated that Moss had Jaxon from three months old and was the only parent Jaxon knew. It did not hear any credible evidence that Jaxon was physically unsafe. Under Moss's care, Jaxon had excelled in school, qualified for the Youth Olympics Games, and participated in other activities. Jaxon also attended church. The court stated that Moss testified that Jaxon had a loving attachment to her, and there was no evidence to the contrary. It further stated, "She's been the only mother figure he has, and continuity is important. This child needs permanence, including his need for stability and continuance of the relationship he has with Ms. Moss." The court found it was in the best interest of Jaxon to terminate parental rights and granted the petition for adoption.

¶ 54    On June 22, 2023, the court filed a written order granting the petition to adopt. It found Charles was unfit "for failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." It further found it was in the best interest of Jaxon for Charles's parental rights to be terminated and adjudged the child of Moss. Charles appealed.

14

¶ 55                                II. ANALYSIS

¶ 56    On appeal, Charles argues the court's unfitness and best interest findings were manifestly erroneous. He also contends there is an error in the court's written order. We begin our review with the court's order.

¶ 57                      A. Correction to the Written Judgment

¶ 58    Charles argues that the written judgment needs corrected where it conflicts with the court's oral judgment. We agree.

¶ 59    In announcing the judgment at the fitness hearing, the court specifically found Moss failed to prove Charles unfit for failure to maintain a reasonable degree of interest and concern, but proved Charles failed to maintain a reasonable degree of responsibility. The court's written judgment, however, states that Charles failed to maintain a reasonable degree of interest, concern, and responsibility. Under these circumstances, the oral judgment controls. *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993). Therefore, pursuant to Illinois Supreme Court Rule 366(a)(1) (eff. Feb. 1, 1994)—which provides this court with all "powers of amendment of the trial court"—we modify the judgment to reflect the finding of unfitness is based solely on Charles's failure to maintain a reasonable degree of responsibility as to Jaxon's welfare. See *Pliske v. Yuskis*, 83 Ill. App. 3d 89, 96 (1980); *Smeja v. County of Boone*, 34 Ill. App. 3d 628, 634 (1975).

¶ 60                          B. Finding of Unfitness

¶ 61    Charles also challenges the court's granting of the petition for adoption. He argues the court's unfitness and best interests findings were manifestly erroneous.

¶ 62    A parent's surrender or consent is required in all adoption cases unless, *inter alia*, the court finds the parent is unfit as defined in section 1 of the Adoption Act (Act) (750 ILCS 50/1 (West 2020)). *Id.* § 8(a)(1). The Act defines an "unfit person" as "any person whom the court shall find

15

to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption." *Id.* § 1(D). The statute also provides specific grounds of unfitness. *Id.* "[T]he petitioner must prove by clear and convincing evidence that the parent is unfit." *In re Brandon K.*, 2017 IL App (2d) 170075, ¶ 22.

¶ 63    Relevant here, section 1(D)(b) of the Act provides that a parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). In considering whether a parent is unfit pursuant to section 1(D)(b), the court must focus on the parent's reasonable efforts, rather than the success of those efforts. *In re Konstantinos H.*, 387 Ill. App. 3d 192, 204 (2008). "The court should examine a parent's conduct in the context in which it occurs, including any difficulty in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and the motivation underlying the failure to visit." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79 (1990)). A general interest is insufficient. *In re Adoption of Syck*, 138 Ill. 2d at 272-73.

¶ 64    A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 65    Here, the circuit court found Charles unfit for failing to maintain a reasonable degree of responsibility as to Jaxon's welfare. Charles argues this finding was manifestly erroneous because his phone calls, gifts, and continuous attempts to speak to Jaxon demonstrated reasonable effort under the circumstances of his incarceration and Moss prevented further communication with Jaxon by not answering his calls.

¶ 66    Although we consider the limitations of Charles's incarceration, such fact does not absolve Charles from maintaining a reasonable degree of responsibility. *In re Gwynne P.*, 346 Ill. App. 3d 584, 593 (2004). A reasonable degree of responsibility may also be shown by the frequency and nature of "letters, telephone calls, and gifts to the child," under the circumstances. *In re Adoption of Syck*, 138 Ill. 2d at 279.

¶ 67    While Charles contends Moss improperly interfered by not answering his calls, the circuit court found Moss's testimony most credible on this issue. Because the lower court is in a superior position to view the witnesses' demeanor and conduct, we defer to the lower court's credibility determinations. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 222. This court, "which has only a cold record before it, will not presume to substitute its own independent evaluation of witness credibility unless the trial court's evaluation is found to be manifestly erroneous." *In re Marriage of Lewis*, 188 Ill. App. 3d 142, 146 (1989). As there is no objective evidence in the record clearly demonstrating the court should have reached the opposite conclusion, we decline to find the ruling was against the manifest weight of the evidence.

¶ 68    Deferring to the trial court and accepting Moss's testimony as credible, Charles's infrequent calls to Jaxon fail to show a reasonable degree of responsibility, especially where two of Charles's witnesses testified that he called them a few times a week. See *In re M.I.*, 2016 IL 120232, ¶ 36 (evidence of "sporadic visitation sufficiently warrants the juvenile court's finding of unfitness"); *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 12 (same). Moreover, Charles failed to pursue any action that would establish his responsibility for Jaxon through court action. See *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 12. Although Charles sometimes contacted Jaxon and provided some gifts, "a parent is not fit merely because the parent has demonstrated *some* interest in or affection for [his or her] children; *** *responsibility* must be

17

reasonable." (Emphases in original and internal quotation marks omitted.) *Id.* ¶ 13. We therefore find the opposite conclusion is not clearly apparent and affirm the court's finding of unfitness.

¶ 69                                C. Best Interest Finding

¶ 70    After a parent is found unfit, the circuit court proceeds to determine whether the child's best interest would be served by the petitioner's adoption of the child and termination of the natural parent's parental rights. *In re Adoption of Syck*, 138 Ill. 2d at 277. In making a best-interest decision, the circuit court considers several statutory factors in the context of the child's age and specific needs. 705 ILCS 405/1-3(4.05) (West 2020). These include: (a) the child's physical safety and welfare; (b) development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including love, security, familiarity, and continuity of relationships with parental figures; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. *Id.* On review, we will not overturn the circuit court's finding unless it is against the manifest weight of the evidence. *In re Jaron Z.*, 348 Ill. App. 3d 239, 261-62 (2004).

¶ 71    On appeal, Charles argues the court erred because the factors weigh in his favor where the evidence showed that he loved his son and there were serious allegations that Moss abused children. We disagree.

¶ 72    Again, "[t]his court will not reweigh the evidence or reassess the witnesses' credibility." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). The court here found that Moss's testimony that she

18

did not have a history of abusing children was more credible and there is no objective evidence in the record to rebut that finding.

¶ 73 Jaxon spent all—but three months—of his life with Moss. Moss is employed, has the financial means to raise Jaxon, and provides a safe, appropriate environment. While in her care, Jaxon was current on his vaccinations, performed well in school, and attended church. He was also involved in sports and was particularly successful in Taekwondo. Although Charles and Jaxon may love each other and have a bond, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). It was undisputed that Charles will remain imprisoned until Jaxon reaches adulthood and, based on the court's consideration of the statutory factors, we cannot find the court's best interest determination was manifestly erroneous.

¶ 74                                    III. CONCLUSION

¶ 75 The court's unfitness and best interest findings were not manifestly erroneous. The court's written judgment, however, conflicts with its oral judgment. Accordingly, we modify the written judgment to reflect Charles was unfit only based on his failure to maintain a reasonable degree of responsibility and otherwise affirm the circuit court's judgment.

¶ 76 Affirmed as modified.

19